**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BIG SANDY RANCHERIA ENTERPRISES, a federally-chartered corporation, *Plaintiff-Appellant*, v. ROB BONTA,[*] in his official capacity as Attorney General of the State of California; NICOLAS MADUROS, in his official capacity as Director of the California Department of Tax and Fee Administration, *Defendants-Appellees.* | No. 19-16777 D.C. No. 1:18-cv-00958-DAD-EPG OPINION |

Appeal from the United States District Court
for the Eastern District of California
Dale A. Drozd, District Judge, Presiding

Argued and Submitted November 19, 2020
San Francisco, California

Filed June 16, 2021

---

[*] Rob Bonta has been substituted for his predecessor, Xavier Becerra, as California Attorney General under Fed. R. App. P 43(c)(2).

Before: Sidney R. Thomas, Chief Judge, and Mary M.
Schroeder and Marsha S. Berzon, Circuit Judges

Opinion by Chief Judge Thomas;
Concurrence by Judge Berzon

## SUMMARY[**]

### Indian Tribes

The panel affirmed the district court's dismissal of an
action in which Big Sandy Rancheria Enterprises, a federally
chartered tribal corporation wholly owned and controlled by
the Big Sandy Rancheria of Western Mono Indians, sought
declaratory and injunctive relief against the Attorney General
of California and the Director of the California Department
of Tax and Fee Administration concerning taxes applied to
inter-tribal sales of cigarettes.

The district court dismissed for lack of subject matter
jurisdiction the Corporation's challenge to California's
cigarette excise tax as applied to the Corporation's wholesale
cigarette distribution business, and dismissed for failure to
state a claim the Corporation's remaining challenges to other
regulations governing cigarette distribution in California, as
applied to the Corporation's business.

The Corporation's fifth cause of action alleged that
federal common law and tribal sovereign immunity

---

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

preempted California's Cigarette Tax Law as applied to the Corporation. The panel held that the district court properly dismissed this cause of action on jurisdictional grounds pursuant to the Tax Injunction Act, which prohibits district courts from enjoining, suspending, or restraining the assessment, levy, or collection of any tax under State law where a plain, speedy, and efficient remedy may be had in the courts of such State. The panel held that the district court properly declined to apply the Indian tribes exception to the Tax Injunction Act's jurisdictional bar. This exception, set forth at 28 U.S.C. § 1362, confers federal jurisdiction over claims brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior. The Corporation contended that as an "incorporated tribe" under § 17 of the Indian Reorganization Act, it was an "Indian tribe or band" for jurisdictional purposes. Based on the relevant statutory language, legislative history, and circuit precedent narrowly construing § 1362, the panel concluded that the Corporation was not an "Indian tribe or band" within the meaning of § 1362, and therefore could not invoke § 1362 to avoid the Tax Injunction Act's jurisdictional bar.

The Corporation's remaining causes of action challenged California's Tobacco Directory Law, which requires the Attorney General to maintain and publish a directory of tobacco product manufacturers and tobacco brand families that have been approved for sale in California, and California's licensing, reporting, and recordkeeping requirements in connection with cigarette distribution, on two grounds: (1) applying the challenged regulations to the Corporation's cigarette sales to tribal retailers on other reservations violates "principles of Indian tribal self-governance;" and (ii) federal regulation of "trade with Indians within Indian country" under the Indian Trader Statutes

preempts the challenged regulations as applied to the Corporation's intertribal wholesale cigarette business.

The panel held that the district court properly dismissed both theories for failure to state a claim. The panel concluded that tribal sovereignty principles did not preclude California from regulating the Corporation's intertribal wholesale cigarette sales under the challenged regulations. The Corporation conceded that it left the Rancheria to sell cigarettes to tribal retailers on other reservations. The Corporation did not allege that the challenged regulations were discriminatory, nor did it plausibly allege that federal law barred the Directory Statute's application to the Corporation. The Corporation therefore failed to state a claim that the challenged regulations, as applied to its off-reservation conduct, infringed tribal self-governance. The panel joined the Tenth Circuit and Oklahoma Supreme Court in treating tribe-to-tribe sales made outside the tribal enterprise's reservation as "off reservation" activities subject to non-discriminatory state laws of general application. The panel held that the Corporation also failed to state a claim that the Indian Trader Statutes preempted any of the challenged regulations as applied to its intertribal wholesale cigarette business.

Judge Berzon concurred in part and acquiesced dubitante in part. Judge Berzon joined the majority opinion in affirming the dismissal of the Corporation's first four claims. She wrote that she differed from the majority in its certainty that the Corporation was not an "Indian tribe or band" for jurisdictional purposes under 28 U.S.C. § 1362, the Indian tribes exception to the Tax Injunction Act's jurisdictional bar. Because Judge Berzon had doubts about the majority's conclusion but was not prepared to say it was certainly

wrong, she wrote separately, dubitante, as to Part III of the majority's opinion, which affirmed the dismissal of the Corporation's fifth cause of action for lack of jurisdiction.

## COUNSEL

Tim Hennessy (argued), John M. Peebles, and Michael A. Robinson, Peebles Kidder Bergen & Robinson LLP, Sacramento, California, for Plaintiff-Appellant.

Michael John von Loewenfeldt (argued), Wagstaffe von Loewenfeldt Busch & Radwick LLP, San Francisco, California; James V. Hart (argued) and Peter F. Nascenzi, Deputy Attorneys General; Karen Leaf, Senior Assistant Attorney General; Attorney General's Office, Sacramento, California; for Defendants-Appellees.

**OPINION**

THOMAS, Chief Judge:

This appeal presents the question whether California cigarette tax regulations apply to inter-tribal sales of cigarettes by a federally chartered tribal corporation wholly owned by a federally recognized Indian tribe. We conclude that they do, and we affirm the judgment of the district court. We have jurisdiction under 28 U.S.C. § 1291.

Specifically, this case involves Big Sandy Rancheria Enterprises ("the Corporation"), a federally chartered tribal corporation wholly owned and controlled by the Big Sandy Rancheria of Western Mono Indians ("the Tribe"). The Corporation sought declaratory and injunctive relief against the Attorney General of California ("Attorney General") and the Director of the California Department of Tax and Fee Administration ("Director").

The district court dismissed the Corporation's challenge to California's cigarette excise tax as applied to the Corporation's wholesale cigarette distribution business, for lack of subject matter jurisdiction, and dismissed the Corporation's remaining challenges to other regulations governing cigarette distribution in California, as applied to the Corporation's business, for failure to state a claim.

I

A

"Since 1959 California has imposed an excise tax on the distribution of cigarettes." *Cal. State Bd. of Equalization v.*

*Chemehuevi Indian Tribe*, 474 U.S. 9, 10 (1985) (per curiam); *see also* Cigarette and Tobacco Products Tax Law ("Cigarette Tax Law"), Cal. Rev. & Tax. Code §§ 30001–30483. "Distribution" includes, in pertinent part, "[t]he sale of untaxed cigarettes or tobacco products in th[e] state" or "[t]he use or consumption of untaxed cigarettes or tobacco products in th[e] state." Cal. Rev. & Tax. Code § 30008.[1] "Use or consumption" means "the exercise of any right or power over cigarettes or tobacco products incident to the ownership thereof." *Id.* § 30009. However, "use or consumption" excludes the "the keeping or retention" of such products "by a licensed distributor for the purpose of sale." *Id.* § 30009. The "sale of cigarettes or tobacco products by the manufacturer to a licensed distributor" is not subject to the excise tax. *Id.* § 30103.

Distributors pay the excise tax by purchasing stamps from the state to affix to each package of cigarettes before distribution. *Id.* §§ 30161, 30163(a). California's scheme recognizes that the state may not tax certain distributions. For example, "cigarettes sold . . . by a Native American tribe to a member of that tribe on that tribe's land" are "exempt from state excise tax pursuant to federal law." Cal. Health & Safety Code § 104556(j); *see also Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101–02 (2005) ("States are categorically barred from placing the legal incidence of an excise tax on a tribe or on tribal members for sales made inside Indian country without congressional authorization." (quotation marks omitted; emphasis removed)); *Montana v. Blackfeet Tribe*, 471 U.S. 759, 764 (1985) ("Indian tribes and

---

[1] "'Untaxed cigarette' means any cigarette which has not yet been distributed in such manner as to result in a tax liability" under state law. *Id.* § 30005.

individuals generally are exempt from state taxation within their own territory."). In such instances, a "user or consumer," who is "obligated to pay the tax," owes the tax, and the exempt distributor is responsible for collecting the tax from such purchasers and remitting it to the state. Cal. Rev. & Tax. Code §§ 30008(b), 30107, 30108(a), 30184; *see also Chemehuevi*, 474 U.S. at 11 ("[Section] 30107 clearly seems to place on consumers the obligation to pay the tax for all previously untaxed cigarettes." (citation omitted)).

The excise taxes "provide funding for local and state programs, including health services, antismoking campaigns, cancer research, and education programs." Cal. Bus. & Prof. Code § 22970.1. To facilitate the collection of taxes, California requires all distributors to obtain two state-issued licenses, one of which must be renewed annually. *See* Cal. Rev. & Tax. Code § 30140; *see also* Cal. Bus. & Prof. Code § 22975(a). California enacted the annual licensing requirement in 2003, *see* Cigarette and Tobacco Products Licensing Act ("Licensing Act"), Cal. Bus. & Prof. Code §§ 22970–22991, upon a finding that "[t]ax revenues ha[d] declined by hundreds of millions of dollars per year due, in part, to unlawful distributions and untaxed sales of cigarettes and tobacco products," *id.* § 22970.1(b). To "help stem the tide of untaxed distributions and illegal sales," California imposed licensing obligations on manufacturers, importers, wholesalers, distributors, and retailers. *Id.* § 22970.1(d). Under the Licensing Act, distributors and wholesalers may not sell to unlicensed entities. *See id.* § 22980.1(b)(1). Violations of the Licensing Act are misdemeanors punishable by a $5000 fine, one year of imprisonment, or both. *See id.* § 22981. The Licensing Act does not apply to any person "exempt from regulation" under federal law. *Id.* § 22971.4.

Additionally, California imposes reporting and recordkeeping requirements on cigarette distributors. They must file monthly reports with the California Department of Tax and Fee Administration respecting their distributions both taxable and exempt. *See* Cal. Rev. & Tax. Code §§ 30182(a), 30183(a); 18 Cal. Code Regs. § 4031. Distributors must also "keep . . . records, receipts, invoices, and other pertinent papers with respect" to their cigarette dealings, which the state may examine. Cal. Rev. & Tax. Code §§ 30453, 30454; 18 Cal. Code Regs. §§ 4026(a), 4901. Similarly, under the Licensing Act, distributors must retain copies of transaction records to assist the state's auditing and collection efforts. *See, e.g.*, Cal. Bus. & Prof. Code §§ 22978.1, 22978.5 (requiring distributors and wholesalers to maintain sale records, including invoices and receipts, "during the past four years" and to make such records available upon the state's request).

In addition to collecting taxes, California regulates cigarette manufacturers pursuant to a 1998 settlement agreement between four major cigarette manufacturers and 46 states, the District of Columbia, and five United States territories. *See King Mountain Tobacco Co., Inc. v. McKenna*, 768 F.3d 989, 991 (9th Cir. 2014). The Master Settlement Agreement ("Agreement") requires manufacturers that are signatories to the Agreement—"participating manufacturers"—"to make substantial annual cash payments to the settling states and territories, in perpetuity, to offset the increased cost to the health care system created by smoking." *Id.*; *see also* Agreement § IX(c).[2] In return, participating manufacturers obtained "a release of past, present, and certain

---

[2] For the text of the Agreement, *see* https://oag.ca.gov/sites/ all/files/agweb/pdfs/tobacco/1msa.pdf.

future claims against them." Cal. Health & Safety Code § 104555(e); *see also* Agreement § XII. The parties to the Agreement further negotiated the "Non-Participating Manufacturers Adjustment." *See* Agreement § IX(d). Under that provision, a participating manufacturer may substantially reduce its payment to a state if it has lost market share as a result of competition from non-participating manufacturers. However, a state may avoid that result if it enacts and "diligently enforce[s]" a "[q]ualifying [s]tatute," under which non-participating manufacturers must deposit money into an escrow account based on the number of cigarettes sold in a state the prior year. *Id.* § IX(d)(2)(B).

California's qualifying statute is the California Reserve Fund Statute ("Escrow Statute"), Cal. Health & Safety Code §§ 104555–104558. In enacting the Escrow Statute, the California Legislature found:

> It would be contrary to the policy of the state if non-participating manufacturers could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the state will have an eventual source of recovery from them if they are proved to have acted culpably. It is thus in the interest of the state to require that these manufacturers establish a reserve fund to guarantee a source of compensation and to prevent those manufacturers from deriving large, short-term profits and then becoming judgment proof before liability may arise.

*Id.* § 104555(f); *see also King Mountain Tobacco*, 768 F.3d at 991 (explaining that because not all tobacco manufacturers were parties to the Agreement, "[t]he states feared that these non-participating manufacturers . . . would become insolvent against future liability for smoking-related health care costs").

The Escrow Statute requires non-participating manufacturers to either become participating manufacturers under the Agreement or to place funds annually into an escrow account at a specified rate for each "unit[] sold" in California during the previous year. Cal. Health & Safety Code § 104557(a). "Units sold" refers to "the number of individual cigarettes sold to a consumer in the state by the applicable tobacco product manufacturer, whether directly or through a distributor, retailer, or similar intermediary . . ., regardless of whether the state excise tax was due or collected." *Id.* § 104556(j). "Units sold" excludes "cigarettes sold . . . by a Native American tribe to a member of that tribe on that tribe's land, or that are otherwise exempt from state excise tax pursuant to federal law." *Id.* The required escrow payment roughly equals the annual per-cigarette-sold payment required from participating manufacturers and was around $6.95 per carton in 2018. The money in the escrow account may be released back to an non-participating manufacturer only: (i) to pay a judgment or settlement; (ii) as a refund for overpayment to the account; or (iii) after the funds have spent 25 years in the account. *Id.* § 104557(b).

The Escrow Statute further requires non-participating manufacturers to "certify" annually that they have complied with their escrow obligations. *Id.* § 104557(c). To ensure such compliance, states have enacted "directory" statutes (also known as "contraband" or "complementary" statutes).

California's Tobacco Directory Law ("Directory Statute"), Cal. Rev. & Tax. Code § 30165.1, requires the Attorney General to maintain and publish a directory of tobacco product manufacturers and tobacco brand families that have been approved for sale in California. *See id.* § 30165.1(c). To be listed on this directory, a manufacturer must annually certify to the Attorney General that it is either a participating manufacturer that has made all payments owed under the Agreement or is a non-participating manufacturer that has complied with its escrow obligations as well as the Licensing Act. *See id.* § 30165.1(b). The Directory Statute deems off-directory cigarettes contraband. *See id.* § 30165.1(e)(1) (prohibiting any person from affixing a tax stamp to or paying the tax on off-directory cigarettes); *see also id.* § 30165.1(e)(2) (prohibiting any person from "sell[ing], offer[ing], or possess[ing] for sale" in California, "ship[ping] or otherwise distribut[ing] into or within [California], or import[ing] for personal consumption in [California]" off-directory cigarettes).

## B

The Tribe is federally recognized, *see* Indian Entities Recognized and Eligible to Receive Services from the U.S. Bureau of Indian Affairs, 86 Fed. Reg. 7554, 7554 (Jan. 29, 2021), with offices on the Big Sandy Rancheria (the "Rancheria") in Auberry, California.

The Tribe has not adopted a tribal constitution according to the procedures set forth in section 16 of the Indian

Reorganization Act ("IRA"),[3] but instead has adopted governing documents under 25 U.S.C. § 5123(h)(1) (recognizing tribe's "inherent sovereign power to adopt governing documents under procedures other than those specified" in section 16). The Tribe owns and controls the Corporation, which was chartered and organized in 2012 under section 17 of the IRA, *see id.* § 5124.[4] The Corporation's Board of Directors is comprised of the same members as the Tribe's governing body, the Tribal Council.

The Corporation is a "tobacco distribution enterprise" whose purpose is to "foster economic development on the Rancheria and to create economic opportunities for Tribal members." The enterprise has four subdivisions: (i) BSR Distributing, a wholesale distributor of tobacco products "to Indian tribes and Indian-owned entities in Indian Country"; (ii) BSR Distribution, which was "organized to engage in the distribution of tobacco products to non-Indian owned entities," but has "not made any sales" yet; (iii) Big Sandy Manufacturing, which was "organized to engage in the manufacture of tobacco products" on the reservation, but has

---

[3] *See* 25 U.S.C. § 5123(a) ("Any Indian tribe shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, and any amendments thereto, which shall become effective when" both "ratified by a majority vote of the adult members of the tribe or tribes at a special election authorized and called by the Secretary under such rules and regulations as the Secretary may prescribe" and "approved by the Secretary[.]").

[4] The Secretary may "issue a charter of incorporation" to "any tribe" that petitions for one. *Id.* The charter is not operative until "ratified by the governing body of such tribe" and "shall not be revoked or surrendered except by Act of Congress." *Id.* "[A]ll Indian tribes" may petition for a section 17 charter regardless whether they have voted against the IRA's application. *Id.* §§ 5125–26.

"not yet received" a Manufacture of Tobacco Products permit from the United States Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau; and (iv) Big Sandy Importing, which was "organized to engage in the importation of tobacco and tobacco products onto the Big Sandy Rancheria" and obtained a Tobacco Importer permit from the [Department of the Treasury], effective November 8, 2017, and expiring on November 7, 2022.

Through Big Sandy Importing and BSR Distributing, the Corporation "purchases tobacco products for non-retail resale exclusively from Indian manufacturers."[5]  It is unclear from the Corporation's allegations whether these purchases occur on the Rancheria or the "Indian manufacturers[']" respective reservations.

BSR Distributing resells these cigarettes "exclusively to Indian tribal governmental, and Indian tribal-member, reservation-based retailers operating within their own Indian reservations [or] Indian Country within the geographical limits of the State of California."  According to the Corporation, these retailers, in turn, sell to "individual

---

[5] The Corporation has purchased cigarettes from Azuma Corporation, which is wholly owned by the Alturas Indian Rancheria, a federally recognized Indian tribe in Alturas, California, and Grand River Enterprises Six Nations ("GRE"), a Canadian corporation wholly owned by members of the Six Nations of the Grand River, a First Nation of Canada.  In November 2018, after GRE entered into a settlement agreement with California, agreeing to, among other things, comply with its escrow obligations, the Corporation stopped importing cigarettes from GRE.  *See* Settlement Agreement Between the People of the State of California and Grand River Enterprises Six Nations, Ltd. (Nov. 2018), https://tinyurl.com/GRE-settlement; *see also* California Tobacco Directory, https://oag.ca.gov/tobacco/directory (listing GRE-manufactured cigarettes).

customers within [the] retailers' own Indian reservation / Indian Country."

In 2008, before obtaining a section 17 charter, the Tribe, doing business as "BSR Distribution," applied for a distributor's license. In response, a state representative sought to clarify whether BSR Distribution intended to "sell to [California] retailers and wholesalers," in which case "a distributor's license [would be] required." The Corporation does not allege that it ever responded to this letter or otherwise followed up on the application.

Between 2011 and 2016, the Attorney General corresponded with the Corporation and its various business entities, raising concerns about compliance with state and federal laws governing cigarette sales. During that period, the Attorney General accused the Corporation of violating the Cigarette Tax Law, the Directory Statute, and California's licensing requirements by selling "off-directory" cigarettes—"without collection of state tax"—"to non-tribal members in California," and without a state-issued license. The Corporation continues to distribute cigarettes in California.

C

In July 2018, the Corporation sued the Attorney General and the Director in their official capacities. Seeking declaratory and injunctive relief, the complaint alleged that: (i) federal common law and tribal sovereignty preempt the Directory Statute as applied to the Corporation; (ii) the Indian Trader Statutes, 25 U.S.C. §§ 261–64, do so as well; (iii) federal common law and tribal sovereignty preempt California's licensing requirements as applied to the

Corporation; (iv) the Indian Trader Statutes do so as well; and (v) federal common law and tribal sovereignty preempt the Cigarette Tax Law as applied to the Corporation.   In connection with its fifth cause of action, the Corporation sought a declaration that it "has no liability" for taxes imposed under the Cigarette Tax Law.

Both the Attorney General and the Director moved to dismiss the fifth cause of action under the Tax Injunction Act, 28 U.S.C. § 1341, which  prohibits district courts from "enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  They both acknowledged an exception to the Tax Injunction Act available to Indian tribes (the "Indian tribes exception") under 28 U.S.C. § 1362, which confers federal jurisdiction over claims "brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior."  *See also Moe v. Confederated Salish & Kootenai Tribes of the Flathead Rsrv.*, 425 U.S. 463, 470–74 (1976) (holding that the Indian tribes exception extends to claims challenging state tax laws).  But they countered that the Corporation is not itself an "Indian tribe or band" and, thus, cannot invoke the federal courts' jurisdiction under § 1362.

The Corporation subsequently amended its complaint to allege that the Corporation itself is a federally recognized Indian tribe, rather than a "federally-chartered corporation wholly owned by . . . a federally recognized Indian tribe." The Director again moved to dismiss the fifth cause of action for lack of subject matter jurisdiction.  The Attorney General likewise moved to dismiss on that ground and to dismiss the other four causes of action for failure to state a claim.

After a hearing on the motions, the district court dismissed the fifth cause of action for lack of jurisdiction and the remaining causes of action with prejudice for failure to state a claim. *See Big Sandy Rancheria Enters. v. Becerra*, 395 F. Supp. 3d 1314, 1334 (E.D. Cal. 2019) ("*Big Sandy*"). The Corporation timely appealed.

## II

We review dismissals for lack of subject matter jurisdiction and for failure to state a claim de novo. *See Hyatt v. Off. of Mgmt. & Budget*, 908 F.3d 1165, 1170 (9th Cir. 2018). To determine whether the Corporation "state[s] a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted), and "sufficient as a legal matter to invoke the court's jurisdiction," we accept the Corporation's factual allegations as true and draw all reasonable inferences in its favor, *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

## III

The district court properly dismissed the Corporation's fifth cause of action on jurisdictional grounds pursuant to the Tax Injunction Act, 28 U.S.C. § 1341, and properly declined to apply the Indian tribes exception to the Tax Injunction Act's jurisdictional bar, *see id.* § 1362.

## A

The Tax Injunction Act prohibits district courts from "enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such

State." *Id.* § 1341. It is well-settled, and the Corporation does not dispute, that the Tax Injunction Act's jurisdictional bar extends to actions for declaratory relief. *See California v. Grace Brethren Church*, 457 U.S. 393, 408–09 (1982) ("[T]he principal purpose of the Tax Injunction Act [is] to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." (internal citation and quotation marks omitted)); *see also Lowe v. Washoe County*, 627 F.3d 1151, 1155 (9th Cir. 2010) ("The Supreme Court repeatedly has characterized the [Tax Injunction] Act as a broad jurisdictional barrier . . . that prohibits both declaratory and injunctive relief." (internal citation and quotation marks omitted)). Nor does the Corporation dispute that California provides a "plain, speedy and efficient remedy" within the meaning of § 1341. *See Grace Brethren*, 457 U.S. at 414 n.31, 417; *see also Jerron W., Inc. v. Cal. State Bd. of Equalization*, 129 F.3d 1334, 1339 (9th Cir. 1997).

The only objection that the Corporation raises to the district court's jurisdictional determination is based on 28 U.S.C. § 1362, which grants district courts "original jurisdiction of all civil actions" arising under federal law and "brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior [("Secretary")]." *Id.* Section 1362 constitutes an exception to the Tax Injunction Act. *See Moe*, 425 U.S. at 470–74. The Corporation contends that as the "incorporated tribe" under section 17 of the Indian Reorganization Act, it is an "Indian tribe or band" for jurisdictional purposes. We disagree.

B

Congress enacted the Indian Reorganization Act to enable tribes "to revitalize their self-government through the adoption of constitutions and bylaws" under section 16 of the IRA, *see* 25 U.S.C. § 5126, and "through the creation of chartered corporations, with the power to conduct the business and economic affairs of the tribe," under section 17 of the IRA, *see id.* § 5124. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151 (1973) ("*Mescalero*"); *see also* S. Rep. No. 73-1080 (1934) (explaining that Congress enacted section 17 to "permit Indian tribes to equip themselves with the devices of modern business organization, through forming themselves into business corporations").

By incorporating, a tribe may waive tribal sovereign immunity for its business operations without having to waive that immunity for nonbusiness liability. *Cf. Linneen v. Gila River Indian Cmty.*, 276 F.3d 489, 493 (2002) (explaining that a waiver of immunity from suit in a tribe's "corporate charter in no way affects the sovereign immunity of the [tribe] as a constitutional, or governmental, entity"). A tribal corporation's waiver of sovereign immunity "removes a major market hurdle for a tribal business (because third parties generally do not want to enter into contracts with parties they cannot sue to enforce agreements or to seek tort damages) and puts a tribal business on equal footing with nontribal businesses." *Uniband, Inc. v. Comm'r*, 140 T.C. 230, 261 (2013).

Under section 17, the Secretary "may, upon petition by any tribe, issue a charter of incorporation to such tribe." 25 U.S.C. § 5124. To "become operative," the charter must be ratified "by the governing body of such tribe." *Id.*

"Corporations chartered under section 17 must be wholly owned by the tribe."  Felix S. Cohen's Handbook of Federal Indian Law ("Cohen's Handbook") § 4.04[3][a][ii] p. 258 (2012 ed.); *see also* Bureau of Indian Affairs, Example of a Federal Charter, https://tinyurl.com/BIA-example-charter ("[The Corporation] is a legal entity wholly owned by the EXAMPLE TRIBE, a federally recognized Indian tribe, but distinct and separate from the Tribe.").  The charter "may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description . . ., including the power to purchase restricted Indian lands."  25 U.S.C. § 5124.

C

Based on the relevant statutory language, legislative history, and circuit precedent narrowly construing § 1362, we conclude that the Corporation is not an "Indian tribe or band" within the meaning of § 1362, and that the Corporation therefore may not invoke § 1362 to avoid the Tax Injunction Act's jurisdictional bar.  These conclusions align with Congress's purpose in enacting section 17—"giving tribes the power to incorporate," including "enabl[ing] tribes to waive sovereign immunity, thereby facilitating business transactions."  *Am. Vantage Cos., Inc. v. Table Mountain Rancheria*, 292 F.3d 1091, 1098 (9th Cir. 2002).  In light of this purpose, it would be odd to allow a section 17 corporation to selectively claim the benefits of sovereignty in order to challenge a tax.

1

We begin by interpreting "Indian tribe or band," bearing in mind that "statutes passed for the benefit of Indian tribes, such as [§] 1362, are to be liberally construed, with doubtful expressions being resolved in the Indians' favor." *Gila River Indian Cmty. v. Henningson, Durham & Richardson*, 626 F.2d 708, 712 (1980). "[F]ederal law ordinarily uses the term 'Indian tribe' to designate a group of native people with whom the federal government has established some kind of *political relationship* or 'recognition.'" Cohen's Handbook § 3.02[2] at 132–33 (emphasis added). As stated in the House Report accompanying the bill that became the Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, 108 Stat. 4791 (Nov. 2, 1994), 25 U.S.C. § 5131:[6]

> [F]ederal recognition is . . . [a] *formal political act*, it permanently establishes a *government-to-government* relationship between the United States and the recognized tribe . . . . Concomitantly, it institutionalizes the tribe's quasi-sovereign status, along with all the powers accompanying that status such as the *power to tax*, and to *establish a separate judiciary*. Finally, it imposes upon the Secretary of the Interior specific

---

[6] This act requires the Secretary to publish in the Federal Register a "list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to the Indians because of their status as Indians." 25 U.S.C. § 5131; *see also* 25 C.F.R. §§ 83.5, 83.11.

> obligations to provide a panoply of benefits
> and services to the tribe and its members.

H.R. Rep. No. 103-781 (1994) (emphasis added); *accord* Cohen's Handbook § 3.02[3] at 133.

Although these authorities do not construe "Indian tribe or band" as used in § 1362, they tend to support the district court's construction of "Indian tribe or band" as limited to "the Tribe in its constitutional form," as distinct from its corporate form. *Big Sandy*, 395 F. Supp. 3d at 1324. Section 1362's legislative history provides some additional support for that construction, explaining that the "tribe's desire to have a Federal forum for matters based upon Federal questions is justified" by, *inter alia*, the "unique *governmental status* of Indian tribes." H.R. Rep. No. 89-2040, at 3146 (1966) (emphasis added).

As the Corporation acknowledges, the Tribe, not the Corporation, appears on the Federally Recognized Indian Tribes List, *see* 86 Fed. Reg. 7554, 7554, as a tribe entitled to receive benefits and services from the Department of the Interior. *Cf. Price v. Hawaii*, 764 F.2d 623, 627–28 (9th Cir. 1985) (concluding that "the same factors which govern [tribal] eligibility for federal benefits" under federal regulations "provide some guidance for the jurisdictional inquiry" under § 1362). Even more significantly, the Corporation does not allege that the federal government, in issuing the Tribe a section 17 charter, recognized the Corporation as a distinct political entity or a government. Nor does the Corporation allege that it may exercise governmental functions, such as imposing taxes or establishing a judiciary—powers that Congress has expressly associated with tribal status. *See* H.R. Rep. No. 103-781; *see*

*also Washington v. Confederated Tribes of Colville Indian Rsrv.*, 447 U.S. 134, 152 (1980) ("*Colville*") ("The power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status.").

Section 17 simply does not provide for such recognition. *See* 25 U.S.C. § 5124.  By permitting "any *tribe*" to petition for a charter of incorporation, which—once ratified "by the governing body of *such tribe*"—may convey certain powers to the "incorporated tribe," the statute plainly distinguishes between the tribe and the incorporated tribe.  *Id.* (emphasis added); *see also Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 921 (6th Cir. 2009) ("[T]he language of Section 17 itself—by calling the entity an 'incorporated tribe'—suggests that the entity is an *arm* of the tribe." (emphasis added)).

Because Congress enacted § 1362 (in 1966) a few decades after enacting section 17 (in 1934), Congress could have used the phrase "incorporated tribe" or cross-referenced section 17 in § 1362.  *Cf. Big Sandy*, 395 F. Supp. 3d at 1325 ("Congress was aware when it passed § 1362 that Indian tribes could act in both sovereign and proprietary capacities.").  It did not do so, reinforcing the conclusion that "Indian tribe or band" under § 1362 and the "incorporated tribe" created under section 17 are not synonymous.

## 2

In addition to being a poor fit with the relevant statutory language, the Corporation's position is difficult to square

with our mandate to "narrowly construe[]" the § 1362 "exception to the Tax Injunction Act for Indian tribes." *Ashton v. Cory*, 780 F.2d 816, 820–21 (9th Cir. 1986). For instance, in *Navajo Tribal Utility Auth. v. Ariz. Dep't of Revenue*, 608 F.2d 1228 (9th Cir. 1979), the Navajo Tribal Utility Authority ("Utility Authority"), a "subordinate economic enterprise of the Navajo Indian Tribe," sued Arizona in federal court to challenge state taxes passed through to it by a company from which it purchased electrical power. 608 F.2d at 1229–30. We concluded that the Utility Authority could "not ground jurisdiction on [§] 1362." *Id.* at 1231. We reasoned that § 1362, by its plain terms, "makes no provision for wholly controlled or owned subordinate economic tribal entities." *Id.* We further rejected the argument (made by both the Utility Authority and the United States, as amicus curiae) that because the "[Utility Authority] is ultimately controlled by and closely related to the Tribe itself, it should be treated as a tribe for jurisdictional purposes." *Id.* at 1232. We reasoned that "[i]f the leadership of a tribe or band decides that litigation is necessary to protect the rights of the tribe or band, then [§]1362 will provide federal court access to the tribe or band when the other jurisdictional requirements of the section are also met." *Id.*

The Corporation maintains that *Navajo* "is not controlling here" because *Navajo* "did not involve a section 17 corporation," and the Corporation's Board of Directors is identical to the membership of the Tribal Council, whereas the Utility Authority's leadership was "not synonymous with the Tribal Council." *Id.* at 1232. The Corporation accordingly reasons that its decision to challenge California's tax enforcement scheme is the functional equivalent of the tribal leadership's decision to do so. These arguments are unavailing. *Navajo*'s observation that § 1362 "makes no

provision for wholly controlled or owned subordinate economic tribal entities," *id.* at 1231, easily extends to the Corporation, regardless of its section 17 status, because the Corporation is an economic entity wholly owned and controlled by the Tribe. *See* Cohen's Handbook § 4.04[3][a][ii] at 258 ("Corporations chartered under section 17 must be wholly owned by the tribe.").

Additionally, we agree with the district court that *Navajo*'s holding "did not hinge on the overlap of interests between the political and corporate entities." *Big Sandy*, 395 F. Supp. 3d at 1325. Indeed, we acknowledged that there may be circumstances in which a tribal corporation's interests are "identi[cal]" to the tribe's, but concluded that, even then, "the Tribe itself will be able to protect those interests" if it decides to do so. *Navajo*, 608 F.2d at 1233; *cf. also Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1043, 1046 n.5 (9th Cir. 2000) (noting that the Indian tribes exception to the Tax Injunction Act was satisfied where a section 17 corporation *and* the governing tribe were co-plaintiffs).

*Navajo* also requires us to reject the Corporation's reliance on *Mescalero*. There, the Mescalero Apache Tribe appealed from unfavorable state rulings regarding its liability for state taxes imposed on an off-reservation ski resort that the tribe owned and operated. *Mescalero*, 411 U.S. at 146–47. Reversing in part and affirming in part, the Court observed that it was "unclear from the record whether the Tribe has actually incorporated itself as an Indian chartered corporation" under section 17, but remarked that "the question of tax immunity cannot be made to turn on the particular form in which the Tribe chooses to conduct its business." *Id.* at 157 n.13. Based on this, the Corporation

argues that "[t]he fact that an Indian tribe has the same federal immunity from state taxes whether acting" as a section 16 or 17 entity is "compelling evidence that" § 1362 was intended to permit both entities to "litigate such immunity" in federal court.

But *Navajo* declined to adopt that same reasoning. It explained that *Mescalero* "does not assist" with the jurisdictional question that arises when a tribal corporation invokes § 1362 because the *tribe* initiated the litigation in *Mescalero* and did so "in *state* court." *Navajo*, 608 F.2d at 1232–33 (emphasis added). Then, assuming *arguendo* that *Mescalero* stands for the proposition that "a tax against a tribal enterprise is a tax against the tribe itself,"we nonetheless concluded that "[s]uch a view speaks only to the question of tax immunity, not to the question of federal jurisdiction." *Id.* at 1233.[7]

3

The Corporation's reliance on *Price* is likewise misplaced. There, after assuming *arguendo* that a native Hawaiian tribal group was an "Indian tribe or band," we focused our analysis on whether the tribe had a "governing body duly recognized by the Secretary." *Price*, 764 F.2d

---

[7] The Corporation cites various federal tax authorities reflecting that a section 17 tribal corporation shares the tribe's immunity from federal income tax. *See* Rev. Rul. 81-295 (1981); Rev. Rul. 94-16 (1994); 26 C.F.R. § 301.7701-1(a)(3) ("[T]ribes incorporated under section 17 of the [IRA] . . . are not recognized as separate entities for federal tax purposes."); *Uniband*, 140 T.C. at 262 ("[T]he tribe exists, at least in part, through its section 17 corporation."). Like *Mescalero*, those authorities "speak[] only to the question of tax immunity, not to the question of federal jurisdiction." *Navajo*, 608 F.2d at 1233.

at 626 (quoting § 1362).  We concluded that the group could not claim federal recognition of its governing body under either provision of the IRA because, as Native Hawaiian groups are excluded from the IRA "by its terms," *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1280 (9th Cir. 2004), it had not adopted a constitution and bylaws under section 16 or received a section 17 charter.  *Price*, 764 F.2d at 626.  Because Native Hawaiian groups are not eligible for charters under section 17, we had no occasion to decide whether section 17 incorporation *actually* satisfies § 1362's requirement that a tribe have a federally recognized governing body.  Thus, *Price* is inapposite.[8]

## IV

The Corporation's remaining causes of action challenge the Directory Statute and California's licensing, reporting, and recordkeeping requirements in connection with cigarette distribution on two grounds: (i) applying the challenged regulations to the Corporation's cigarette sales to tribal retailers on other reservations violates "principles of Indian tribal self-governance"; and (ii) federal regulation of "trade with Indians within Indian country" under the Indian Trader Statutes, *see* 25 U.S.C. §§ 261–64, preempts the challenged regulations as applied to the Corporation's intertribal wholesale cigarette business.  The district court properly dismissed both theories for failure to state a claim.

---

[8] Given our determination that the Corporation has failed to meet the threshold requirement of being an "Indian tribe or band," we need not reach the distinct question whether the Corporation has a duly recognized governing body. In addition, because we affirm the dismissal of the fifth cause of action for lack of jurisdiction, we express no opinion as to whether the Corporation has stated a claim that California may not impose any excise taxes on the Corporation's intertribal transactions.

A

"Long ago the [Supreme] Court departed from Mr. Chief Justice Marshall's view that 'the laws of [a state] can have no force' within reservation boundaries." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 141 (1980) (quoting *Worcester v. Georgia*, 31 U.S. 515, 520 (1832)). "[T]here is no rigid rule" that resolves "whether a particular state law may be applied to an Indian reservation or to tribal members." *Id.* at 142. Rather, there are "two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members." *Id*.

The first barrier is that state action may not burden "the right of reservation Indians to make their own laws and be ruled by them."[9] *Id.* (citation and quotation marks omitted). "Indian tribes retain attributes of sovereignty over both their members and their territory." *Id.* (citation and quotation marks omitted). But tribal sovereignty does not extend "beyond what is necessary to protect tribal self-government or to control internal relations." *Montana v. United States*, 450 U.S. 544, 564 (1981).

The second barrier is preemption by federal law, as "Congress has broad power to regulate tribal affairs." *Bracker*, 448 U.S. at 142–43; *see also* U.S. Const. Art. 1, § 8, cl. 3 (empowering Congress to "regulate Commerce . . . with the Indian Tribes"). "Ambiguities in federal law have been construed generously in order to comport with . . . traditional notions of sovereignty and with the federal policy of

---

[9] This right is also known as the "right of tribal self-government." *Id.* at 143. The first amended complaint refers to this right as "tribal sovereignty."

encouraging tribal independence." *Bracker*, 448 U.S. at 143–44. Thus, "in order to find a particular state law to have been preempted by operation of federal law," we need not identify "an express congressional statement to that effect." *Id.* at 144. Rather, where a state seeks to regulate tribal activity that is already governed by a "comprehensive," "detailed," and "pervasive" federal regulatory scheme, this preemption barrier applies. *Id.* at 145–46, 148. "At the same time any applicable regulatory interest of the State must be given weight." *Id.* at 144.

1

Whether state regulation infringes tribal sovereignty depends on *who* is being regulated—Indians or non-Indians—and *where* the activity to be regulated takes place—on or off a tribe's reservation. *Wagnon*, 546 U.S. at 101. Based on the "who" and "where," one of three analytical frameworks applies.

First, "[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *Bracker*, 448 U.S. at 144. Applying this rule in *Moe*, 425 U.S. 463, the Supreme Court invalidated Montana's "vendor license fee" as "applied to a reservation Indian conducting a cigarette business for the Tribe on reservation land; and [the state's] cigarette sales tax, as applied to on-reservation sales by Indians to Indians." *Id.* at 480–81; *see also, e.g.*, *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 454–55 (1995) (invalidating motor fuels tax as applied to tribal retail stores on tribal trust land); *McClanahan v. Ariz. Tax Comm'n*, 411 U.S. 164, 165–66 (1973) (invalidating a tax

on income earned from reservation sources by tribal members residing on the reservation).

Second, when a state "asserts authority over the conduct of *non-Indians* engaging in activity on the reservation," courts must conduct "a particularized inquiry into" and balance the "state, federal, and tribal interests at stake." *Bracker*, 448 U.S. at 145 (emphasis added). Under *Bracker*'s balancing test, "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983). When "a tribe plays an active role in generating activities of value on its reservation" with the aid of non-Indian entities, it has a "strong interest in maintaining those activities free from state interference," in contrast to when tribes "simply allow the sale of items such as cigarettes to take place on their reservations." *Gila River Indian Cmty. v. Waddell*, 967 F.2d 1404, 1410 (9th Cir. 1992).

The Court has "balanced federal, state, and tribal interests in diverse contexts," including where—as here—the challenged regulations are not themselves taxes. *Chickasaw Nation*, 515 U.S. at 458. The Court has upheld such regulations where they are "minimal burden[s] designed to avoid the likelihood that in [their] absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax." *Moe*, 425 U.S. at 483. These permissible burdens have included requiring on-reservation tribal retailers to collect and remit cigarette taxes from non-Indian purchasers, *id.*, and requiring such retailers to maintain records regarding tax-exempt sales, *see Colville*, 447 U.S. at

160 ("[T]he Tribes have failed to demonstrate that [Washington's] recordkeeping requirements for exempt sales are not reasonably necessary as a means of preventing fraudulent transactions.").

Third,   because "state power over Indian affairs is considerably more expansive" "outside the reservation . . . than it is within reservation boundaries," *id.* at 162,  when a tribe or tribal members act outside their reservation, they are subject to "non-discriminatory state law otherwise applicable to all citizens of the State," "[a]bsent express federal law to the contrary." *Mescalero*, 411 U.S. at 148–49; *see also Bracker*, 448 U.S. at 144 n.11 (reaffirming principle). Applying this rule, the Supreme Court has upheld a state's taxation of income derived from a tribe's off-reservation ski resort, *Mescalero*, 411 U.S. at 148–49, and a state cigarette tax on Indian purchasers who were "not members of the Tribe" on whose reservation the sales took place, *Colville*, 447 U.S. at 161.  As to the latter, the Court has explained that taxing such purchasers typically does not "contravene the principle of tribal self-government" because "[f]or most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation." *Id.*  Absent evidence that such nonmembers "have a say in tribal affairs or significantly share in tribal disbursements," "the State's interest in taxing these purchasers outweighs any tribal interest that may exist in preventing the State from imposing its taxes." *Id.*  The Court has warned that balancing interests under *Bracker* when the regulated activity is off-reservation is "inconsistent with the special geographic sovereignty concerns that gave rise to that test." *Wagnon*, 546 U.S. at 112–13.

2

We next turn to the specific federal law that the Corporation identifies as preempting all the challenged state regulations: the Indian Trader Statutes (the "Statutes"), 25 U.S.C. §§ 261–64.  Since 1790, the federal government has sought to regulate persons trading with Indians to "prevent fraud and imposition upon" the latter.  *Cent. Mach. Co. v. Ariz. Tax Comm'n*, 448 U.S. 160, 162 (1980) (quotation marks omitted); *see also Dep't of Tax'n & Fin. of New York v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 70 (1994).    Under the present regulatory scheme, the "Commissioner of Indian Affairs [("Commissioner")] shall have the sole power . . . to appoint traders to the Indian tribes" and to issue regulations "specifying the kind and quantity of goods and the prices at which such goods should be sold to the Indians."  25 U.S.C. § 261.  "Any person desiring to trade with the Indians on any Indian reservation" must follow regulations that the Commissioner "may prescribe for the protection of said Indians."  *Id.* § 262.  The Statutes further authorize the President "to prohibit the introduction of goods, or any particular article, into the country belonging to any Indian tribe," *id.* § 263, and set forth sanctions for "any person other than an Indian of the full blood" who attempts to trade "on any Indian reservation" "without [a] license," *id.* § 264.

Under the Statutes, "the Commissioner has promulgated detailed regulations" regarding "who may qualify to be a trader and how he shall be licensed; penalties for acting as a trader without a license; conditions under which government employees may trade with Indians; articles that cannot be sold to Indians; and conduct forbidden on a licensed trader's premises."    *Warren Trading Post Co. v. Ariz. State Tax*

*Comm'n*, 380 U.S. 685, 689 (1965); *see also* 25 C.F.R. §§ 140.1–.26. Only one implementing regulation, however, addresses traders' on-reservation cigarette sales, and it prohibits such sales to "any Indian under 18 years of age." 25 C.F.R. § 140.17.

On two occasions, the Supreme Court has deemed the Statutes preemptive with respect to state *taxation* of traders to Indian tribes. In *Warren Trading Post*, the Court concluded that the Statutes barred Arizona from imposing a gross sales tax on a non-Indian retail trading business "federally licensed" as an "Indian trader with respect to sales made to reservation Indians on the reservation." 380 U.S. at 691–92. The Court explained that the tax could "disturb and disarrange the statutory plan Congress set up in order to protect Indians against prices deemed unfair or unreasonable by the Indian Commissioner." *Id.* at 691. Later, the Court held that Arizona could not tax the gross receipts of a non-tribal corporation's on-reservation tractor sales to a tribal entity, even though the corporation was not a federally licensed Indian trader. *See Cent. Mach.*, 448 U.S. at 164–65. The Court noted, however, that the Bureau of Indian Affairs had expressly approved the contract for sale and the tribe's budgetary allocation for the tractor purchases. *Id.* at 161, 165 n.4. In the Court's view, it was "irrelevant that [the corporation] was not a licensed Indian trader" because it is "the existence of the Indian trader statutes . . ., and not their administration, that preempts the field of transactions with Indians occurring on reservations." *Id.* at 165.

Subsequent Supreme Court cases have taken a narrower view of the Statutes' preemptive effect. For instance, in upholding Washington's taxation of non-Indians that purchase cigarettes from on-reservation tribal retailers, the

Court clarified that the Statutes "incorporate a congressional desire comprehensively to regulate businesses selling goods to reservation Indians . . . , but no similar intent is evident with respect to sales by Indians to nonmembers of the Tribe." *Colville*, 447 U.S. at 155–56. The Court rejected the notion that the Statutes "go[] so far as to grant tribal enterprises selling goods to nonmembers an artificial competitive advantage over all other businesses in a State." *Id.* at 155.

And most recently, as the Corporation acknowledges, the Court retreated from *Warren Trading Post*'s suggestion that "no state regulation of Indian traders can be valid," *Milhelm*, 512 U.S. at 71; *see also id.* at 74 (rejecting the proposition that the Indian Trader Statutes "bar[] any and all state-imposed burdens on Indian traders"). In *Milhelm*, non-Indian "wholesalers licensed by the Bureau of Indian Affairs . . . to sell cigarettes to reservation Indians" contended that the Statutes preempted various state regulations, including a limit on the number of tax-free cigarettes that they could sell to tribes and reservation retailers as well as requirements that they "hold state licenses," "keep records reflecting the identity of the buyer in each tax-exempt sale[,] and make monthly reports to [New York] on all such sales." *Id.* at 66–67. The Court clarified that the Statutes preempt state regulatory authority only insofar as the state seeks to "dictate 'the kind and quantity of goods and the prices at which such goods shall be sold to the Indians.'" *Id.* at 75 (quoting 25 U.S.C. § 261). New York's quantity limitation on *tax-free* cigarettes did not have this impermissible purpose because "Indian traders remain[ed] free to sell Indian tribes and retailers as many cigarettes as they wish[ed], of any kind and at whatever price." *Id.*

Applying the reasoning of *Moe* and *Colville*, even though those cases "dealt most directly with claims of interference with tribal sovereignty," *id.* at 74, the Court upheld the other challenged regulations as "minimal burdens reasonably tailored to the collection of valid taxes from non-Indians," *id.* at 73–74, 76. It explained that "[i]t would be anomalous" to permit states, under *Moe* and *Colville*, to "impose tax collection and bookkeeping burdens on reservation retailers who are themselves enrolled tribal members," but to hold that the Statutes bar "similar burdens . . . on wholesalers who often (as in this case) are [non-Indian]." *Id.* at 74. The Court reasoned that "[j]ust as tribal sovereignty does not completely preclude States from enlisting tribal retailers to assist enforcement of valid state taxes, the Indian Trader Statutes do not bar the States from imposing reasonable regulatory burdens upon Indian traders for the same purpose." *Id.*

## B

Applying these principles, we affirm the dismissal of the Corporation's preemption challenges to the Directory Statute and California's licensing, recordkeeping, and reporting requirements.

## 1

Tribal sovereignty principles do not preclude California from regulating the Corporation's intertribal wholesale cigarette sales under the challenged regulations.

The Corporation concedes that it leaves the Rancheria to sell cigarettes to tribal retailers on other reservations. The Corporation does not allege that the challenged regulations are discriminatory nor, for the reasons stated below, does the

Corporation plausibly allege that federal law bars the Directory Statute's application to the Corporation.  *See Mescalero*, 411 U.S. at 148–49.  The Corporation therefore fails to state a claim that the challenged regulations, as applied to its off-reservation conduct, infringe tribal self-governance.  *See id.* at 148, 153 (explaining that "off-reservation activities are within the reach of state law" so long as the state law is not discriminatory and "[a]bsent express federal law to the contrary"); *see also King Mountain Tobacco*, 768 F.3d at 993 ("*Mescalero* requires that we determine whether Washington's escrow statute is discriminatory and whether King Mountain's activities go beyond the boundaries of the reservation.").

The Corporation does not remain "on reservation" for purposes of the tribal-sovereignty analysis by selling cigarettes on *other tribes'* reservations.  The Corporation's contention that it undertakes its sales activities entirely in "Indian country" disregards that "[t]here is a significant geographical component to tribal sovereignty," *Bracker*, 448 U.S. at 151, and that "Indian tribes are *unique aggregations* possessing attributes of sovereignty over both *their* members and *their* territory."  *United States v. Mazurie*, 419 U.S. 544, 557 (1975) (emphasis added).  The Corporation fails to plausibly allege that California hinders the Tribe's ability to govern its territory and members by prohibiting the Corporation, an unlicensed distributor, from selling off-directory cigarettes outside the Rancheria.  *See Mescalero*, 411 U.S. at 157 (explaining that a tribe does not have "expansive immunity from ordinary" regulation that applies to "businesses throughout the State" when that tribe travels "beyond *its* reservation borders for the purpose of carrying on a business enterprise" (emphasis added)).

We therefore join the Tenth Circuit and Oklahoma Supreme Court in treating tribe-to-tribe sales made outside the tribal enterprise's reservation as "off reservation" activity subject to non-discriminatory state laws of general application. *See Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1172 (10th Cir. 2012) ("[W]hen Indians . . . act outside of their own Indian country . . ., *including within the Indian country of another tribe*, they are subject to non-discriminatory state laws otherwise applicable to all citizens of the state." (emphasis added));[10] *Edmondson v. Native Wholesale Supply*, 237 P.3d 199, 215–16 (Okla. 2010) (concluding that "tribal to tribal transactions" that "extend[ed] beyond the boundaries of any single 'reservation'" constituted "off-reservation conduct"), *cert. denied*, 563 U.S. 960 (2011), *abrogated on other grounds by Bristol-Meyers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773 (2017).

In these circumstances, the district court properly declined to balance federal, state, and tribal interests under *Bracker*. *See Big Sandy*, 395 F. Supp. 3d at 1328–30. *Bracker* balancing is appropriate when a tribe or tribal entity challenges a state's regulation of transactions between the tribe and nonmembers *on the tribe's reservation*. *See, e.g.*, *Bracker*, 448 U.S. at 141 (balancing interests where a tribe

---

[10] Like the tribe in *Muscogee*, where the Tenth Circuit rejected a preemption challenge to Oklahoma's directory statute, *see* 669 F.3d at 1179–80, the Corporation does not allege that California has enforced or threatened to enforce the Directory Statute *on* the Rancheria—for example, by seizing contraband cigarettes there. *Cf. Muscogee*, 669 F.3d at 1180 & n.9 (declining to perform *Bracker* balancing where the tribe alleged enforcement and threatened enforcement of the directory statute *outside* of its reservation, e.g., the seizure of cigarettes "*in transit to the Indian country* of the Nation").

intervened as a plaintiff to challenge Arizona's taxation of a non-Indian company that provided the tribe logging services *on the tribe's reservation*); *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1987) (balancing interests where tribes challenged California's attempt to prohibit them from offering non-Indians high stakes bingo games *on their reservations*); *Gila River Indian Cmty.*, 967 F.2d at 1407, 1410–11 (balancing interests where a tribe challenged Arizona's taxation of non-Indian entity that operated performing arts center *on the tribe's reservation*).

Here, the Corporation does not allege that California seeks to regulate its transactions with non-Indians or nonmembers *on the Rancheria* in a way that infringes on the Tribe's self-governance. Rather, the Corporation claims that the Directory Statute, as applied to the Corporation's sales activities *off the Rancheria*, infringes the Tribe's self-governance. For the reasons already stated, this claim is not cognizable under *Mescalero*, 411 U.S. at 148–49.

2

The Corporation has likewise failed to state a claim that the Indian Trader Statutes preempt any of the challenged regulations as applied to its intertribal wholesale cigarette business.

a

As a preliminary matter, the complaint is devoid of any allegations that the federal government has exercised any shred of oversight—still less "comprehensive," "detailed," or "pervasive" oversight—with respect to the Corporation's alleged Indian trading. *Bracker*, 448 U.S. at 145–46, 148.

Accordingly, the transactions that the Corporation seeks to immunize from state regulation are fundamentally different from the transactions that have led the Court to deem the Statutes preemptive of state regulation as applied to Indian traders.  Specifically, the Corporation does not allege that the federal government has licensed it as an Indian trader or otherwise approved its cigarette sales to tribal retailers on other reservations.  *See Warren Trading Post*, 380 U.S. at 691; *Cent. Mach.*, 448 U.S. at 165 n.4.  Moreover, it strains credulity to deem a lone federal regulation that prohibits on-reservation cigarette sales to Indian minors, *see* 25 C.F.R. § 140.17, "comprehensive" and preemptive federal regulation of cigarette trade within Indian country.  *Warren Trading Post*, 380 U.S. at 688–89.

b

The Supreme Court's reasoning in *Milhelm* further requires dismissal of the Corporation's claims that the Statutes preempt the Directory Statute and California's licensing, recordkeeping, and reporting requirements.

(1)

First, the Corporation's allegation that the Directory Statute impermissibly "specifies the kind and price of goods that may be sold to Indians by limiting the cigarettes that the Tribe may sell . . . to cigarettes of a tobacco product manufacturer or brand family included in the directory" fails under *Milhelm*.  The Directory Statute  prohibits the Corporation from selling certain tobacco products based solely on the product manufacturer's violation of state law and without regard to the type, price, or quantity of the product itself.  So long as the Corporation sources its

cigarettes from manufacturers that comply with their escrow obligations, it "remain[s] free to sell Indian tribes and retailers as many cigarettes" as it wishes, "of any kind, and at whatever price." *Milhelm*, 512 U.S. at 75.

To be sure, non-participating manufacturers may have an economic incentive to pass the cost of escrow deposits on to their consumers, such that the Corporation's compliance with the Directory Statute may very well increase the cost of the cigarettes that it sells.  Notwithstanding this potential downstream effect on pricing, the Directory Statute, unlike the preempted taxation in *Warren Trading Post* and *Central Machinery*, does not directly affect the price that the Corporation charges its consumers.

In sum, the Corporation fails to plausibly allege that the Directory Statute "disturb[s] and disarrange[s] the statutory plan to protect Indians against prices deemed unfair or unreasonable," *Warren Trading Post*, 380 U.S. at 691; *see also* 25 C.F.R. § 140.22 (describing federal government's "duty" to ensure that prices charged to Indians are "fair and reasonable"), or that it impermissibly seeks to "dictate 'the kind and quantity of goods and the prices at which such goods shall be sold to the Indians.'" *Milhelm*, 512 U.S. at 75 (quoting 25 U.S.C. § 261).

(2)

The Corporation also fails to state a claim that the Statutes preempt California's licensing, recordkeeping, and reporting requirements because it does not plausibly allege that those requirements are not "reasonable regulatory burdens" imposed on Indian traders "to assist enforcement of valid state taxes." *Id.* at 74; *see also Colville*, 447 U.S. at 160

(placing the burden on the tribe to show that the challenged regulations are "not reasonably necessary as a means of preventing fraudulent transactions").    Valid state taxes include the cigarette excise taxes that California seeks to collect from customers who purchase cigarettes on reservations to which they do not belong. *See Chemehuevi*, 474 U.S. at 11–12; *see also Colville*, 447 U.S. at 156–59.

These minimal burdens may be imposed on Indian businesses that, like the Corporation, purport to engage only in tax-exempt transactions. *See Colville*, 447 U.S. at 159–60 (reversing the district court, which had struck down recordkeeping requirements with respect to all on-reservation cigarette sales by Indian retailers after finding that none of these retailers' sales were taxable); *Milhelm*, 512 U.S. at 76 (upholding New York law requiring that cigarette wholesalers making on-reservation cigarette sales to tribal retailers "maintain detailed records on tax-*exempt* transactions" (emphasis added)).

The Corporation does not plausibly allege that California's licensing, recordkeeping, and reporting requirements, as applied to its sales to nonmember Indian retailers, are excessive burdens.  As the district court noted, tax enforcement schemes "with even more demanding requirements than those of California have been repeatedly upheld by the Supreme Court as imposing only a 'minimal burden.'" *Big Sandy*, 395 F. Supp. 3d at 1332–33; *see also Milhelm*, 512 U.S. at 64–67, 76 (upholding state laws requiring "[w]holesale distributors of tax-exempt cigarettes" to "hold state licenses," maintain records regarding tax-exempt transactions, and adhere to quantity limitations on the untaxed cigarettes that they could sell to reservation retailers); *Colville*, 447 U.S. at 159–60 (upholding

recordkeeping requirements, which required Indian smokeshop operators to "keep detailed records of both taxable and nontaxable transactions," including, in connection with the latter, "the names of all Indian purchasers, their tribal affiliations, the Indian reservations within which sales are made, and the dollar amount and dates of sales").

Indeed, as the Supreme Court reasoned in *Milhelm*, cigarette *wholesalers*, like the Corporation—which must "maintain detailed records" regarding their transactions—are generally less burdened than Indian retailers whom the state may require to do the same under *Colville* because "wholesale trade typically involves a comparatively small number of large-volume sales." 512 U.S. at 74. The Corporation does not allege otherwise.

In asserting that California's licensing, recordkeeping, and reporting requirements are not "designed to prevent non-Indians from evading taxes," the Corporation disregards the Legislature's findings to the contrary. *See* Cal. Bus. & Prof. Code §§ 22970.1(c) ("The enforcement of California's cigarette and tobacco products tax laws is necessary to collect millions of dollars in lost tax revenues each year."), 22970.1(d) (finding that licensing every person in the distribution chain would "help stem the tide of untaxed distributions and illegal sales"). And as the Attorney General explained below, "[e]ven if [the Corporation] does not owe the tax, or [the Corporation's] customers do not owe the tax, the State's licensing and reporting requirements allow [the State] to see if someone owes the tax, and then, if they do, to collect it." *Big Sandy*, 395 F. Supp. 3d at 1332.

Just because the state-mandated "*reports* would not identify [the Corporation's] retail customers" or any

information about those retailers' downstream transactions, i.e., "the information  necessary to ascertain the products' ultimate taxability," that does not make California's requirements unreasonable.  "[A]lthough the Corporation's reports would not list the identity of its customers, each of its customers' filings would list the Corporation as the seller, thereby allowing the State to compare the Corporation's aggregate monthly outflow with the monthly inflow reported by its customers, and to follow up in the event of discrepancies."  *Id.*  Morever, wholesale distributors must "maintain and make available for examination underlying invoices and other records supporting the required reports"—that is, "exactly the kind of information that would aid . . . in tracking [the Corporation's] downstream sales." *Id.*; *see also* Cal. Bus. & Prof. Code § 22978.5.

The Corporation likewise fails to state a claim that the licensing, recordkeeping, and reporting requirements are generally "incompatible with the federal regulation of trade with Indians in Indian country."  The Corporation does not allege, for instance, that the challenged requirements "could . . . disturb and disarrange the statutory plan" by imposing an "economic burden" on the Corporation that "would eventually be passed on to" tribal purchasers in the form of either pricier, fewer, or shoddier products. *Bracker*, 448 U.S. at 152; *see also Cent. Mach.*, 448 U.S. at 162 (noting that the seller had added the amount of the challenged state tax, nearly $3000, to the price of the tractors purchased by a tribal entity on the reservation).  Nor does the Corporation plausibly allege that the challenged regulations, which enable the state to monitor and police statewide cigarette distribution, usurp or interfere with the Commissioner's "sole power and authority to appoint traders to the Indian tribes." 25 U.S.C. § 261.  The Corporation does not, for example, attribute its

failure to apply for an Indian trader license under 25 U.S.C. § 262 and 25 C.F.R. § 140.9 to California's regulatory scheme or contend that holding the licenses required under California law would somehow prevent it from obtaining an Indian trader license under federal law.

V

For the foregoing reasons, we affirm the district court's dismissal for lack of subject matter jurisdiction and for failure to state a claim.

**AFFIRMED.**

BERZON, Circuit Judge, concurring in part and acquiescing dubitante in part:

I join the majority opinion in affirming the dismissal of Big Sandy Rancheria Enterprises' ("BSRE" or "the Corporation") first four claims. Where I differ from the majority is in the certainty that BSRE is not an "Indian tribe or band" for jurisdictional purposes. 28 U.S.C. § 1362. Nor am I certain, however, that BSRE *is* an "Indian tribe or band." Because I have doubts about the majority's conclusion but am not prepared to say it is certainly wrong, I concur in the judgment but write separately, *dubitante*, as to Part III, affirming the dismissal of BSRE's fifth claim for lack of jurisdiction. *See United States v. Campbell*, 937 F.3d 1254, 1259–61 (9th Cir. 2019) (Berzon, J., dubitante); *United States v. $11,500.00 in U.S. Currency*, 869 F.3d 1062, 1076–77 (9th Cir. 2017) (Hurwitz, J., concurring in part and acquiescing dubitante in part). As the matter of the tribal status of

corporations incorporated under § 17 of the Indian Reorganization Act (IRA), 25 U.S.C. § 5124, is likely to be of continuing significance and the pertinent case law is scant, it seems worth spelling out some of my concerns even though, in the end, they are not of sufficient weight to convince me to reject the majority's ultimate holding.

Under the "Indian Tribes exception," any action that could be brought in federal court under 28 U.S.C. § 1362 is exempt from the Tax Injunction Act's command that challenges to state law be brought first in state court. *See* 28 U.S.C. § 1341; *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Rsrv.*, 425 U.S. 463, 474–75 (1976); *Barona Band of Mission Indians v. Yee*, 528 F.3d 1184, 1187 n.1 (9th Cir. 2008). Section 1362 confers federal jurisdiction over "all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior," arising under federal law. 28 U.S.C. § 1362. Whether this provision encompasses the current suit turns on the scope of the term "any Indian tribe or band."

As the majority points out, Maj. Op. at 22, our analysis of this question must be guided by the canon that "statutes passed for the benefit of Indian tribes, such as [§] 1362, are to be liberally construed, with doubtful expressions being resolved in the Indians' favor." *Gila River Indian Cmty. v. Henningson, Durham & Richardson*, 626 F.2d 708, 712 (1980); *see Bryan v. Itasca County*, 426 U.S. 373, 392 (1976). In this case, construing the statute "liberally . . . in the Indians' favor" with regard to any "doubtful expressions" would mean holding that the statute includes tribes incorporated under § 17 of the IRA, like BSRE, and that the district court therefore has jurisdiction to consider BSRE's claim under the Tax Injunction Act. The key question, then,

is whether the scope of "any Indian tribe or band" in § 1362 is the type of "doubtful expression[]" to which the Indian canon of construction applies.

Case law construing either § 1362 or § 17 is extremely sparse, and Congress has provided little guidance on how the statutes' terms are to be construed.  The question whether § 17 corporations are an "Indian tribe or band" for jurisdictional purposes appears to have never been squarely addressed by our circuit or by any other federal court of appeals.  Faced with an untrodden statutory and precedential backdrop, the majority has reached a conclusion that is plausible and perhaps correct.  I write separately, however, because the majority's conclusion is not the *only* one that could be drawn against the pertinent backdrop.

First, I view the majority's focus on whether the Corporation, itself and independently, is a federally recognized tribe as misguided.  *See* Maj. Op. at 22–25.  It is undisputed that Big Sandy Rancheria is a federally recognized tribe.  The relevant question is therefore not whether BSRE is federally recognized for the purposes of § 1362, but whether BSRE, in its incorporated form, is identical with Big Sandy Rancheria for jurisdictional purposes.

Framed in this way, I am not certain that BSRE's position that § 17 corporations are "Indian tribe[s] or band[s]" for jurisdictional purposes is, as the majority has it, a "poor fit with the relevant statutory language."  Maj. Op. at 23.  Section 17 of the IRA empowers the Secretary of the Interior to "upon petition by any tribe, issue a charter of incorporation *to such tribe*," provided that "such charter shall not become operative until ratified by the governing body of such tribe."

25 U.S.C. § 5124 (emphasis added).  The § 17 charter "may convey *to the incorporated tribe*" the power to purchase and alienate property, including restricted Indian lands.  *Id.* (emphasis added).

This statutory language does, as the majority points out, distinguish between the Tribe's governing body and its corporate entity.  But by issuing the corporate charter "to such tribe" and referring to a § 17 corporation as the "incorporated tribe," the statute can be read to identify § 17 corporations as also "tribe[s]," whether or not distinct entities from the tribe as organized in its governmental capacity. Section 1362—enacted, as the majority points out, several decades after § 17, *see* Pub. L. 89-635, § 1, Oct. 10, 1966, 80 Stat. 880 (codified at 28 U.S.C. § 1362)—does not limit its grant of jurisdiction to suits brought by the *governing body* of an Indian tribe or band, nor to tribes organized under the specific structures set out in the IRA.  A plausible reading of the statute's silence is that § 1362 encompasses tribal entities regardless of the organizational structure or capacity in which they bring suit.

It is this reasoning that guided the only other Ninth Circuit opinion to consider whether § 17 corporations qualify for the Tax Injunction Act's "Indian tribes exception."  In *White Mountain Apache Tribe v. Williams*, 810 F.2d 844 (9th Cir. 1985), the White Mountain Apache Tribe, in its capacity as a § 17 corporation, brought a § 1983 claim in federal court challenging Arizona's power to tax a joint venture between the incorporated tribe and a private timber operation.  *See id.* at 846–47; *id.* at 865 (B. Fletcher, J., dissenting).  The majority concluded that the Tribe had failed to state a claim under § 1983; it did not consider whether the court had jurisdiction to consider any such claim.

In dissent, however, Judge Fletcher concluded that it did. Because she would have held that the Tribe had asserted a viable § 1983 claim, she considered whether the incorporated tribe was entitled to bring suit based on those claims and, if so, whether any such action was "barred in the federal courts" by the Tax Injunction Act. *Id.* at 865 (Fletcher, J., dissenting). Judge Fletcher reasoned that, because "[t]he plain language of section 1362 . . . does not distinguish between the 'governmental' tribe provided for in IRA section 16 and the 'incorporated tribe' provided for in section 17," the § 17 entity was an "Indian tribe or band" under § 1362. *Id.* at 868 (quoting 25 U.S.C. §§ 476–77 (now codified at 25 U.S.C. § 5123–24)). So, reviewing the same statutory text, Judge Fletcher drew the opposite conclusion to that drawn by the majority here.

Likewise, Judge Fletcher in *White Mountain Apache* took the opposite view from that of the majority here as to other indicia of congressional intent. She noted first that "[w]hen Congress passed section 1362 in 1966, it was fully aware that Indian tribes could act in both sovereign and proprietary capacities," and then concluded that the "failure to limit explicitly the scope of section 1362 to actions brought by tribes in their governmental capacity suggests that [Congress] intended the provision to encompass actions brought by tribes in their corporate capacity as well." *Id.* The majority here draws the exact opposite conclusion from the same legislative history. *See* Maj. Op. at 22–23. That the text and legislative history of the jurisdictional statute have been interpreted by different members of this court as commanding directly opposite outcomes suggests that, at the very least, § 1362's reference to "Indian tribe[s] or band[s]" may be the type of doubtful expression entitled to construction favorable to the tribe.

Nor do I find, in my own review of the legislative history, a persuasive answer to the question whether Congress intended § 1362's application to "Indian tribe[s] or band[s]" to include § 17 corporations. As the Supreme Court pointed out in *Moe*, Congress's purpose in enacting § 1362 was "to open the federal courts to the kind of claims that could have been brought by the United States as trustee, but for whatever reason were not so brought." 425 U.S. at 472. The relevant case law does not paint a crystal-clear picture of what actions *could* be brought by the United States as trustee. But the United States appears to have represented the interests of § 17 incorporated tribes in at least one legal action. *See Md. Cas. Co. v. Citizens Nat. Bank of W. Hollywood*, 361 F.2d 517, 518–19 (5th Cir. 1966). The federal government is also empowered to hold lands in trust for § 17 incorporated tribes. *See Carlson v. Tulalip Tribes of Wash.*, 510 F.2d 1337, 1339 (9th Cir. 1975). And, as *Moe* held, the United States is empowered to "seek[] to enjoin the enforcement of a state tax law" to vindicate tribal interests. 425 U.S. at 474. Against this limited case law, a plausible inference from the statute's purpose and ambiguous text is that Congress intended to open federal courts to claims vindicating the interests of tribes in their § 17 incorporated capacity.

Third, I believe the majority overstates our mandate to "narrowly construe[]" the § 1362 exception to the Tax Injunction Act. Maj. Op. at 24 (quoting *Ashton v. Cory*, 780 F.2d 816, 820 (9th Cir. 1986)). *Ashton*'s conclusion that the § 1362 exception to the Act "has been narrowly construed by our court" relied exclusively on cases "refus[ing] to extend the exception to include *individual members* of Indian tribes" suing in a personal capacity. *Id.* at 820–21 (emphasis added) (citing Comenout v. Washington, 722 F.2d 574, 577 (9th Cir.1983); Dillon v. Montana, 634 F.2d 463, 469 (9th

Cir.1980)). Its holding has been applied only once since, in a case declining to apply the exception to a private enterprise owned by tribal members. *See Amarok Corp. v. Nev. Dep't of Tax'n*, 935 F.2d 1068, 1069–71 (1991).

I do not read these cases as sanctioning in general a cramped construction of the jurisdictional statute. Rather, the construction of § 1362 in the cited cases reflects a straightforward understanding of the distinction between a sovereign entity and its citizens. A court's refusal to apply the jurisdictional statute to private citizens and corporations does not narrow the statutory definition of "Indian tribe or band," any more than a refusal by the Supreme Court to assert original jurisdiction over a suit by a private citizen of a state would constitute a narrow construction of Art. III, § 2, cl. 2 of the U.S. Constitution, which extends the Court's original jurisdiction to suits in which states are a party.

*Navajo Tribal Util. Auth. v. Arizona Dep't of Revenue*, 608 F.2d 1228 (9th Cir. 1979), does, however, present a wrinkle for a more forgiving reading of the case law. As the majority points out, *Navajo* rejected an expansive reading of the jurisdictional statute in part on the ground that "[i]f the leadership of a tribe or band decides that litigation is necessary," then that leadership is free to bring suit itself under § 1362. *Id.* at 1232. In the present case, I remain puzzled as to why the Big Sandy Rancheria tribal council—a body that, by the § 17 charter, is identical in its membership to the BSRE Board—chose not to sidestep the jurisdictional question altogether by bringing suit *qua* tribal council. But even so, that the tribal council *could have* initiated suit in its governmental capacity does not necessarily mean that, as a statutory matter, the same body is foreclosed from initiating a federal suit in its incorporated form. *Cf. Mescalero Apache*

*Tribe v. Jones*, 411 U.S. 145, 158 n.13 (1973) ("[T]he question of tax immunity cannot be made to turn on the particular form in which the Tribe chooses to conduct its business.").

In the end, I am not convinced that *Navajo*'s interpretation of the jurisdictional statute squarely forecloses federal jurisdiction here. *Navajo* held only that § 1362 "does not cover subordinate, semi-autonomous tribal entities." 608 F.2d at 1231.[1]  That case concerned the Navajo Nation's public utility company, which enjoyed a "substantial" relationship with the tribe and over which the tribal government "exercise[d] some measure of control." *Id.* at 1232.  But in declining to assert jurisdiction, the *Navajo* court emphasized the utility authority's "substantial degree of autonomy" from the tribal government, noting that the corporation's Board was "not synonymous with the Tribal Council or even a committee thereof.  Rather, it [wa]s a somewhat, although not a completely, independent entity." *Id.*

By contrast, § 17 corporations appear by definition to lack autonomy.  Charters of incorporation are issued at the discretion of the Secretary of the Interior; may be revoked only by an Act of Congress; and "confer only powers that the Secretary of the Interior is willing for the corporation to possess." *Uniband, Inc. v. Comm'r*, 140 T.C. 230, 262 (2013) (citing *Md. Cas. Co.*, 361 F.2d at 520); *see* 25 U.S.C. § 5124.  What's more, § 17 corporations are treated as

---

[1] Even with this holding—which may or may not encompass § 17 corporations—the Ninth Circuit appears to go further in limiting the scope of § 1362 than other circuits have.  *See* 1 Cohen's Handbook of Federal Indian Law § 7.04 n. 18 (N. Jessup, Ed., 2019).

identical to tribal governments for purposes of federal tax immunity. *See* 26 C.F.R. § 301.7701-1(a)(3). And, although this court has never addressed the question, several circuits have held—as the majority acknowledges, Maj. Op. at 23—that § 17 corporations are "arms of the tribe" for purposes of sovereign immunity. *See Amerind Risk Mgmt. Corp. v. Malaterre*, 633 F.3d 680, 685 (8th Cir. 2011); *Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 921 (6th Cir. 2009); *Md. Cas. Co*, 361 F.2d at 521–22 (adopted as binding precedent by the 11th Circuit, *see Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc)). The analyses relevant to assessing federal tax and sovereign immunity are, of course, distinct from the jurisdictional analysis. *See In re Prairie Island Dakota Siou*x, 21 F.3d 302, 304 (8th Cir. 1994). But in my view, these features of the § 17 corporation complicate the latter question and render the present case sufficiently distinct from *Navajo* to merit closer consideration.

Finally, I address the majority's assertion that it would be "odd" to allow tribes to allow a § 17 entity to "selectively claim the benefits of sovereignty." Maj. Op. at 20. I do not see why this is so. First, I note again that, although this circuit has never addressed the question, every circuit to have considered whether § 17 corporations are entitled to inherent sovereign immunity has held that they are. *See cases cited supra*; *see also Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 n.8 (10th Cir. 2010); Clay Smith, *Tribal Sovereign Immunity: A Primer*, 50 Advocate 19, 20–21 (May 2007) ("The principal legal difference [between § 17 corporations and other tribal corporations] is that, while section 17 corporations retain their tribal status—and, accordingly, sovereign immunity in the absence of a 'sue and be sued' waiver—the other species

of corporations are not imbued automatically with such status."). The Supreme Court reinforced this principle in *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014), when it held that tribes are entitled to sovereign immunity when engaging in commercial activity both on- and off-reservation, *id.* at 790.

That many § 17 corporations choose to *waive* their inherent immunity has no bearing on whether they are "tribe[s]" under § 1362. Tribes, like all sovereigns, may waive immunity when doing so is beneficial to their interests. *See United States v. State of Oregon*, 657 F.2d 1009, 1014 (9th Cir. 1981). As we held in *State of Oregon*, one of the "[c]lear policy considerations . . . militat[ing] in favor of [a] tribe's power to consent to suit" is the concern that "non-Indian interests might prudently avoid contracts with Tribes that would otherwise prove beneficial to the Indians, with the result that Tribes wishing to engage in business would be needlessly impeded." *Id.* Accordingly, tribes may consent to suit as an act of prudent self-government. *See id.*

As our precedent and that of other circuits makes clear, a waiver of sovereign immunity does not negate inherent sovereignty. As *State of Oregon* pointed out, some tribal constitutions ratified under § 16 of the IRA, like some § 17 charters, contain "sue or be sued" clauses that can be interpreted as waiving immunity for the relevant government. *See id.* at 1013 n. 11; *see also Linneen v. Gila River Indian Cmty.*, 276 F.3d 489, 492 (9th Cir. 2002). But the majority does not and cannot plausibly argue that tribes with constitutions ratified by the Department of the Interior pursuant to § 16 are not "Indian tribe[s] . . . duly recognized by the Secretary of the Interior." 28 U.S.C. § 1362. Native nations organized under § 16, like all sovereign entities, may

waive immunity in some contexts while invoking the benefits of sovereignty in others. I see no reason why, as a matter of principle, tribes incorporated under § 17 should be any different.

This is not to conclude definitively that § 17 entities are the "tribe" for jurisdictional purposes. But I am dubious as to the majority's assertion that an entity that waives sovereign immunity may not at the same time selectively claim the benefits of sovereignty in other contexts. The selective enjoyment of the benefits of sovereignty is the prerogative of all sovereign entities; tribes are no different.

I join the majority's conclusion because, with the exceptions noted, its reasoning is persuasive, and I cannot be certain, faced with an ambiguous statutory text, a thin legislative history, and sparse case law, that the majority's conclusion is incorrect. But I am quite certain that the question is a closer one than the majority opinion indicates. And as we appear to be the first federal circuit court to address this precise question, I believe there is some value in expressing these doubts publicly. I therefore concur with the majority in full as to Parts I, II, and IV, and concur, *dubitante*, as to Part III.