**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KING MOUNTAIN TOBACCO COMPANY, INC.; CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION, *Plaintiffs-Appellants*, <br><br> v. <br><br> ROBERT MCKENNA, Attorney General of the State of Washington, *Defendant-Appellee*. | No. 13-35360 <br><br> D.C. No. 2:11-cv-03018-LRS <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of Washington
Lonny R. Suko, District Judge, Presiding

Argued and Submitted
August 27, 2014—Seattle, Washington

Filed September 26, 2014

Before: John T. Noonan, Susan P. Graber,
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

# SUMMARY[*]

## Indian Law

Affirming the district court's summary judgment, the panel held that the Yakama Treaty of 1855 did not preclude enforcement of the State of Washington's escrow statute, which requires tobacco companies to place money from cigarette sales into escrow to reimburse the State for health care costs related to the use of tobacco products.

The panel held that Washington's escrow statute was a nondiscriminatory law and that the activities of King Mountain Tobacco Co., a company owned and operated by an enrolled member of the Yakama Indian Nation, were largely off-reservation. Accordingly, absent express federal law to the contrary, King Mountain was subject to the escrow statute. The panel held that the plain text of the Yakama Treaty did not create a federal exemption from the escrow statute. Specifically, Article II of the Treaty, which established the boundaries of the Yakama reservation and reserved it for Yakama use and benefit, was not an express federal law that exempted King Mountain from the escrow statute. Nor was Article III, which reserved to the tribe the right to travel on public highways and the right to hunt and fish. The panel held that the district court did not err by declining to make findings regarding the Treaty's meaning to the Yakama people at the time of its signing because the meaning to the Yakama people could not overcome the clear words of the Treaty.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Randolph H. Barnhouse (argued) and Justin J. Solimon, Johnson Barnhouse & Keegan LLP, Los Ranchos de Albuquerque, New Mexico, for Plaintiffs-Appellants.

David M. Hankins (argued), Senior Counsel; Joshua Weissman, Assistant Attorney General; Robert W. Ferguson, Attorney General of the State of Washington, Olympia, Washington, for Defendant-Appellee.

**OPINION**

CHRISTEN, Circuit Judge:

King Mountain Tobacco Company and the Confederated Tribes and Bands of the Yakama Indian Nation (collectively "Appellants") sued the Attorney General of the State of Washington for declaratory and injunctive relief from Washington's escrow statute, Wash. Rev. Code §§ 70.157.005–70.157.030 (2013). The escrow statute requires King Mountain to place money into escrow to reimburse the State for health care costs related to the use of tobacco products. The amount placed in escrow is based on the number of cigarette sales made that are subject to state cigarette taxes. Appellants argue that the Yakama Treaty of 1855 is an "express federal law" that exempts the Yakama people from Washington's escrow statute. The State argues that the Treaty does not preclude it from regulating tobacco products sold nationally and that, as a nondiscriminatory state law that is not expressly preempted by federal law, the escrow statute applies to King Mountain. The district court granted summary judgment in favor of the State, and

Appellants appeal. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the judgment of the district court.

## BACKGROUND

The Treaty between the Confederated Tribes and Bands of the Yakama Indian Nation and the United States was negotiated and signed in 1855. *See* Treaty with the Yakamas, 12 Stat. 951 (1855).[1] Under the Treaty, the people of the Yakama Nation agreed to cede a majority of their lands to the United States in return for certain reserved rights. *Id.* The Yakama Nation also agreed to live on reserved lands held in trust by the United States. *Id.*

### A. King Mountain Tobacco Company

King Mountain Tobacco Company is owned and operated by Delbert Wheeler, an enrolled member of the Yakama Nation. King Mountain initially obtained all of its tobacco from an entity in North Carolina. Today, King Mountain grows some of its tobacco and manufactures its tobacco products, in part, on trust lands within the boundaries of the Yakama Nation. In 2009, approximately 3.1% of the tobacco used in King Mountain's products was grown on trust lands. By 2010, that amount had risen to 9.5%. In 2011, it rose again, to 37.9%.

King Mountain ships its tobacco crop to Tennessee where it is threshed. From there, the tobacco is sent to a factory in North Carolina where more tobacco is added to the reservation tobacco. This process is called "blending." After

---

[1] The Treaty refers to the tribe as the "Yakamas" but the parties use "Yakama," so we adopt that convention.

blending is complete, the tobacco is sent back to the reservation. King Mountain sells cigarettes and other tobacco products on the reservation, throughout Washington, and in about sixteen other states.

## B.  Washington's Escrow Statute

In 1998, forty-six states, the District of Columbia, and five United States territories settled a lawsuit against four major cigarette manufacturers, creating a Master Settlement Agreement (MSA). The MSA requires the manufacturers to make substantial annual cash payments to the settling states and territories, in perpetuity, to offset the increased cost to the health care system created by smoking. In return, the manufacturers obtained a release of specified past and future tobacco-related claims against them.

Not all cigarette manufacturers joined the MSA, either initially or later. The states feared that these non-participating manufacturers (NPMs) would become insolvent against future liability for smoking-related health care costs. Because of this concern, many states adopted escrow statutes. The escrow statutes require NPMs to either join the MSA or pay into a qualified escrow fund. *See, e.g.*, Wash. Rev. Code § 70.157.020(b) (2013).

Washington adopted an escrow statute to offset smoking-related health care costs caused by NPMs. *Id.* § 70.157.005. For each qualifying unit of tobacco sold, NPMs must make a flat-fee payment into an escrow fund. *Id.* § 70.157.020(b)(1). The NPMs earn interest on the escrow account balances. *Id.* § 70.157.020(b)(2). The money in the escrow account may be released only: (1) to pay a judgment or settlement; (2) as a refund to the NPM for overpayment to the account; or (3)

as a refund to the NPM after the funds have been in the account for 25 years. *Id.*

King Mountain initially complied with Washington's escrow statute; but in 2011, it filed this lawsuit to contest its obligation to comply.

## C.  The District Court's Order

Appellants and the State filed cross-motions for summary judgment in district court.  Appellants offered evidence of the Yakama people's understanding of the 1855 Treaty to support their claim that the Treaty is an express federal law that exempts King Mountain's activities from state economic regulation.  The district court made findings regarding how Washington's escrow statute operates and regarding King Mountain's business.

The district court began its analysis by observing:  "It is well-settled that a state can regulate (i) off-reservation transactions conducted by Native Americans; (ii) on-reservation sales to persons other than Native Americans; and (iii) impose certain requirements upon Native Americans in regulating those sales."  It also explained, quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973):  "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State."

The district court found that "King Mountain's operations involve extensive off-reservation activity" and that "the cigarettes and roll-your-own tobacco products produced by King Mountain are not principally generated from the use of

reservation land and resources." Rejecting King Mountain's argument to the contrary, the district court concluded: "Washington['s] escrow statutes are non-discriminatory state laws of general application." Applying *Mescalero*, the court ruled that "King Mountain ha[d] not met its burden of showing express federal law exempting its business from state regulation nor [did] it offer case authority invalidating application of any state's escrow statute based on an Indian Treaty or any other federal law." The district court granted the State's motion for summary judgment and denied Appellants' motion.

## STANDARD OF REVIEW

This court reviews a district court's order granting summary judgment de novo. *Ramsey v. United States*, 302 F.3d 1074, 1077 (9th Cir. 2002). Viewing the evidence in the light most favorable to the nonmoving party, we determine "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* We also review de novo the interpretation and application of treaty text. *Cree v. Flores*, 157 F.3d 762, 768 (9th Cir. 1998) (*Cree II*). "Underlying factual findings, including findings of historical fact, are reviewed for clear error." *Id.*

## DISCUSSION

Appellants argue that summary judgment in favor of the State was improper because the district court failed to consider evidence showing how the Yakama people understood the Treaty in 1855. They also argue that the Yakama Treaty is express federal law exempting the Yakama people from the Washington escrow statute. In response, the

State counters that its escrow statute is a nondiscriminatory law that applies to the Yakama people's off-reservation activities because there is no express federal law that prevents its application.

The Supreme Court has explained: "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero*, 411 U.S. at 148–49. Accordingly, our court has explained: "[A] state's authority to tax tribal members is limited depending on the subject and location of the tax." *Ramsey*, 302 F.3d at 1078. We also have explained that federal laws, such as treaties, ordinarily must be interpreted in the light most favorable to Indians:

> When a court interprets a state's taxation of Indians' off-reservation activities, the court determines if there is an express federal law prohibiting the tax. The federal law must be interpreted in the light most favorable to the Indians, and extrinsic evidence may be used to show the federal government's and Indians' intent. Unlike the federal standard, there is no requirement to find express exemptive language *before* employing the canon of construction favoring Indians.

*Id.* at 1079. But "even though legal ambiguities are resolved to the benefit of the Indians, courts cannot ignore plain language that, viewed in historical context and given a fair appraisal, clearly runs counter to a tribe's later claims." *Or. Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S.

753, 774 (1985) (citations and internal quotation marks omitted).

## A. Washington's escrow statute is a nondiscriminatory law and King Mountain's activities are largely off-reservation.

As an initial matter, *Mescalero* requires that we determine whether Washington's escrow statute is discriminatory and whether King Mountain's activities go beyond the boundaries of the reservation. *See* 411 U.S. at 148–49. Appellants argue that Washington's escrow statute is discriminatory, without explaining what the statute discriminates against.[2]  Their citation to *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 335 (1977), is inapposite because they provide no evidence to suggest that the Washington escrow statute treats in-state cigarette manufacturers differently than out-of-state manufacturers.  We conclude the district court correctly determined that Washington's escrow statute is nondiscriminatory.

Appellants also argue that the district court erred by creating a new rule requiring courts to determine whether a product is principally generated from reservation land before extending the Treaty protections.  The district court found that "King Mountain's operations involve extensive off-reservation activity."  It also found that "the cigarettes and roll-your-own tobacco products produced by King Mountain are not principally generated from the use of reservation land

---

[2] At oral argument, Appellants took the position that the statute discriminates against the Yakama because it requires the Tribe to waive its treaty rights.  This argument is circular; it presupposes that the Treaty exempts the Yakama from Washington's escrow statute.

and resources." This was a proper application of *Mescalero* by the district court, not a new test. It was appropriate for the court to make a preliminary determination about whether King Mountain's activities were "off-reservation" for purposes of applying the test from *Mescalero*. *See Ramsey*, 302 F.3d at 1079.

The district court found that King Mountain ships its tobacco crop to Tennessee where it is threshed. Then the tobacco is sent to a factory in North Carolina where more tobacco is purchased and blended with reservation tobacco. In 2011, less than half of the tobacco in King Mountain's products was grown on the reservation. After the blending process, the tobacco is sent back to the reservation, where much of it is made into cigarettes. King Mountain sells its tobacco products throughout Washington and in about sixteen other states. Appellants do not argue that any of the district court's factual findings were clearly erroneous, *see Cree II*, 157 F.3d at 768, and we find no support for Appellants' implied argument that the district court clearly erred by finding that King Mountain's tobacco-related activities were largely "off-reservation."

Having concluded that Washington's escrow statute is nondiscriminatory and that King Mountain's tobacco related activities take place largely off-reservation, *Mescalero* requires that we decide whether there is an express federal law that exempts King Mountain's activities from state economic regulation. *See Mescalero*, 411 U.S. at 148–49; *see also Ramsey*, 302 F.3d at 1077, 1079; *Cree v. Waterbury*, 78 F.3d 1400, 1403 (9th Cir. 1996) (*Cree I*).

### B.  The plain text of the Yakama Treaty does not create a federal exemption from Washington's escrow statute.

Appellants argue that the district court erroneously applied the standard for determining whether a federal law, rather than a state law, applies to an Indian tribe.  They also argue that the Yakama Treaty is express federal law that exempts King Mountain from Washington's escrow statute. The State responds that the district court correctly applied the *Mescalero* test and concluded that the Treaty is not an express federal law that exempts King Mountain from state economic regulations.  We agree with the State.

Contrary to King Mountain's position, the district court did not apply the "express exemptive language" test for determining whether a federal law applies to the tribe.  *See Ramsey*, 302 F.3d at 1078–79 (explaining the differences between the "express exemptive language" test, which applies to federal laws, and the "express federal law" test, which applies to state laws).  The district court applied the test from *Mescalero* to determine whether there was an "express federal law exempting [King Mountain's] business from state regulation."   The district court did not engage in an exhaustive review of the meaning the Yakama would have given to the Treaty as of 1855 because it reasoned that "King Mountain can prove no set of facts in support of the claim that Washington's escrow statutes are in conflict with the Treaty or federal law which would entitle Plaintiffs to relief."[3]

---

[3] The State argues that Appellants did not preserve their factual inquiry argument regarding the meaning of the Yakama Treaty to the Yakama people.  In its motion for summary judgment, King Mountain repeatedly

Because the Washington escrow statute is a nondiscriminatory law, Appellants bear the burden of proving that the Yakama Treaty is an express federal law that exempts it from Washington's escrow statute. *See, e.g.*, *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 160 (1980) ("The Tribes, and not the State as the District Court supposed, bear the burden of showing that the [state] recordkeeping requirements which they are challenging are invalid."). "A treaty can constitute such an express federal law." *Cree I*, 78 F.3d at 1403. As we have noted, there is no requirement to find express exemptive language *before* employing the canon of construction favoring Indians under the state standard. *Ramsey*, 302 F.3d at 1079. But "[t]he canon of construction regarding the resolution of ambiguities in favor of Indians . . . does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986); *see also Klamath Indian Tribe*, 473 U.S. at 774 ("[E]ven though legal ambiguities are resolved to the benefit of the Indians, courts cannot ignore plain language that, viewed in historical context and given a fair appraisal, clearly runs counter to a tribe's later claims." (citations and internal quotation marks omitted)).

---

stated that an Indian Treaty must be construed in favor of the Indians, and it summarized the evidence that it submitted in support of this argument. After reviewing the record, we conclude that the State's waiver claim is not supported. Appellants continually argued that the district court had to consider the meaning of the Treaty to the Yakama people, and that it believed there were no disputed facts about how the Yakama people understood the Treaty in 1855. These arguments are not inconsistent and they were preserved.

The Indian canon of construction does not alter the outcome in this case because the relevant text of the Yakama Treaty is not ambiguous and the plain language of the Treaty does not provide a federal exemption from the Washington escrow statute.

**1. Article II of the Yakama Treaty does not constitute an express federal law that exempts King Mountain from Washington's escrow statute.**

Article II of the Yakama Treaty establishes the physical boundaries of the Yakama reservation and prohibits non-Indians from inhabiting reservation land unless an exception applies. Article II of the Treaty reads in relevant part:

> There is, however, reserved, from the lands above ceded for the use and occupation of the aforesaid confederated tribes and bands of Indians, the tract of land included within the following boundaries, to wit: [Description of the physical boundaries of the reservation]
>
> All which tract shall be set apart and, so far as necessary, surveyed and marked out, for the exclusive use and benefit of said confederated tribes and bands of Indians, as an Indian reservation; nor shall any white man, excepting those in the employment of the Indian Department, be permitted to reside upon the said reservation without permission of the tribe and the superintendent and agent. And the said confederated tribes and bands agree to remove to, and settle upon, the same, within one year after the ratification of this

> treaty. In the mean time it shall be lawful for them to reside upon any ground not in the actual claim and occupation of citizens of the United States; and upon any ground claimed or occupied, if with the permission of the owner or claimant.

Treaty with the Yakamas, art. II, 12 Stat. 951 (1855).

Appellants argue that, under the Treaty "the Yakama people were to be the sole residents of the reserved lands ('use and occupation') and were to be the sole beneficiaries of the resources cultivated on the reserved lands ('exclusive use and benefit')." They conclude that as understood by the Yakama, the Treaty "would preserve [the tribe's] traditional practices of using their lands for growing tobacco and trading that product with other Yakama and non-Yakama alike, without economic restrictions."

Article II defines the geographic boundaries of the Yakama reservation, and reserves it for Yakama use and benefit, while prohibiting non-Indians from living on the reserved land. The "use and occupation" phrase describes the agreement that the reserved land would be dedicated for the Yakama to live on and work on: "There is, however, reserved, from the lands above ceded for the *use and occupation* of the aforesaid confederated tribes and bands of Indians, the tract of land included within the following boundaries." *Id.* (emphasis added). The "exclusive use and benefit" language concerns who may live on reservation land: "All which tract shall be set apart and, so far as necessary, surveyed and marked out, for the *exclusive use and benefit* of said confederated tribes and bands of Indians, as an Indian reservation; nor shall any white man . . . be permitted to

reside upon the said reservation without permission . . . ." *Id.* (emphasis added).

There is no ambiguity in Article II requiring us to decide how the Treaty would be interpreted with regard to the rights of the Yakama to trade outside the reservation. Washington's escrow statute does not interfere with King Mountain's ability to grow tobacco on reservation lands and benefit from the sale of its tobacco products. Further, Supreme Court authority precludes interpreting the Yakama Treaty in the manner urged by Appellants; "exclusive benefit" cannot mean that King Mountain is free to sell cigarettes to non-Indians and nonmembers without any regulation by the state. *See Confederated Tribes of Colville Indian Reservation*, 447 U.S. at 151.

In *Confederated Tribes of Colville Indian Reservation*, the Supreme Court explained that a "State may sometimes impose a nondiscriminatory tax on non-Indian customers of Indian retailers doing business on the reservation." *Id.* In that case, the Court held that cigarette sales by a tribe to non-Indians and nonmember Indians were taxable by the state, even though sales to tribal members were not taxable by the state and the tribe imposed its own tax. *Id.* at 155–56, 160–61. The Court explained that state taxes were not preempted by federal law and did not interfere with tribal self-government. *Id.* at 155–56. In *Colville*, the Supreme Court specifically addressed the same treaty at issue here, the Yakama Treaty of 1855. *Id.* at 156.

The Washington escrow statute is not a tax. King Mountain earns interest on the money held in escrow and may receive a refund after 25 years. Wash. Rev. Code § 70.157.020(b)(2) (2013). This provision is significant

because the escrow scheme imposes a less significant burden on trade than the tax approved by the Supreme Court in *Colville*. Further, *Colville* involved activity by the Yakama tribe, 447 U.S. at 139–40, whereas the activity here is by a private company owned by one Yakama tribal member. We fail to see how a cigarette tax on tribal activity would not be preempted by the Yakama Treaty, but a less intrusive escrow requirement on a private business owned by one tribal member would be preempted.

Although a treaty may constitute an express federal law that could exempt tribal activity from state economic regulation, *Cree I*, 78 F.3d at 1403, Article II of the Yakama Treaty does not provide such an exemption in this case. Article II does not address trade, and there is no ambiguity that required the district court to conduct an exhaustive review to discern the meaning the Yakama people would have given to the Treaty at the time of its signing. We agree with the district court that Article II does not provide an express federal exemption from Washington's escrow statute.

**2. Article III of the Yakama Treaty does not constitute an express federal law that exempts King Mountain from Washington's escrow statute.**

Article III of the Yakama Treaty reserves to the tribe the right to travel on public highways and the right to fish and hunt. Appellants claim that "[t]his Court's controlling case law has interpreted Article III as unequivocally prohibiting imposition of economic restrictions or pre-conditions on the Yakama people's Treaty right to engage in the trade of tobacco products." The language of Article III and our precedent do not support this claim. The relevant part of Article III reads:

*And provided*, That, if necessary for the public convenience, roads may be run through the said reservation; and on the other hand, the right of way, with free access from the same to the nearest public highway, is secured to them; as also the right, in common with citizens of the United States, to travel upon all public highways.

Treaty with the Yakamas, art. III, 12 Stat. 951 (1855). As shown by the plain text of Article III, the Treaty reserved to the Yakama the right "to travel upon all public highways." Nowhere in Article III is the right to trade discussed.

*Cree I* and *Cree II* involved the same Article III provision of the Yakama Treaty. *Cree II*, 157 F.3d at 764; *Cree I*, 78 F.3d at 1402. In *Cree I*, our court explained that the Yakama Nation brought suit to prevent the State of Washington "from applying state truck license and permit fees to members of the Yakama tribe." 78 F.3d at 1401. The district court granted summary judgment in favor of the Yakama Nation "on the ground that the phrase 'in common with,' as used in the Treaty in reference to the highway right" precluded imposition of those fees. *Id.* at 1401–02. Our court reversed the district court's ruling and remanded for fact-finding regarding the meaning the parties would have given to the highway right at the time the Treaty was executed. *Id.* at 1404.

On remand, the district court conducted an extensive review of the facts and made several findings. *Cree II*, 157 F.3d at 766. It granted summary judgment in favor of the Yakama Nation after concluding that the Treaty provided an exemption for the Yakama people from the Washington truck

license and permit fees. *Id.* at 764. We affirmed the district court's decision. *Id.* at 774. We reasoned that the Treaty was evidence of the importance of the right to travel to the Yakama, *id.* at 772, and concluded that "the Treaty clause must be interpreted to guarantee the Yakamas the right to transport goods to market over public highways without payment of fees for that use," *id.* at 769.

This right was reaffirmed in *United States v. Smiskin*, 487 F.3d 1260 (9th Cir. 2007). *Smiskin* involved Yakama members who were criminally indicted for trafficking in contraband cigarettes. *Id.* at 1262. The federal statute criminalizing this conduct incorporated state law definitions and notice requirements. *Id.* at 1263. We affirmed a district court order dismissing the indictment because the Yakama Treaty exempted the Yakama people from complying with state law notice requirements. *Id.* at 1272. We concluded that "[a]pplying [that] type of requirement to the Yakamas imposes a condition on travel that violates *their treaty right to transport goods to market without restriction*." *Id.* at 1266 (emphasis added).

We had previously found ambiguity in Article III's right to travel, and required application of the Indian canon of construction to clarify the extent of that right. *See Cree I*, 78 F.3d at 1404. But the right to travel is express in Article III of the Yakama Treaty, and the *Cree* cases involved the right to travel (driving trucks on public roads) for the purpose of transporting goods to market. In *Smiskin*, we rejected the government's argument that the right to travel did not apply when the Yakama were engaged in commerce. 487 F.3d at 1266–67 ("[T]he right to travel overlaps with the right to trade under the Yakama Treaty such that excluding commercial exchanges from its purview would effectively

abrogate our decision in *Cree II* and render the Right to Travel provision truly impotent."). These cases clarified the extent of the right to travel found in Article III of the Yakama Treaty.

But there is no right to trade in the Yakama Treaty. The Indian canon of construction "does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *Catawba Indian Tribe*, 476 U.S. at 506. The district court did not err by granting summary judgment to the State without making findings about the historic meaning of the Treaty to the Yakama people, because the Treaty's meaning to the Yakama people cannot overcome the plain and unambiguous text of the Treaty. *See Klamath Indian Tribe*, 473 U.S. at 774. Article III does not provide an express federal exemption from Washington's escrow statute.

## CONCLUSION

Washington's escrow statute is a nondiscriminatory law that applies to off-reservation activity. Appellants failed to prove that the Yakama Treaty is an express federal law that exempts King Mountain from Washington's escrow statute. The plain language of the Yakama Treaty does not provide an express federal exemption from the escrow statute. And the district court did not err by declining to make findings regarding the Treaty's meaning to the Yakama people at the time of its signing, because the meaning to the Yakama people cannot overcome the clear words of the Treaty. We affirm the district court's order granting summary judgment

in favor of the State and dismissing Appellants' motion for summary judgment.

**AFFIRMED.**