# United States Court of Appeals
### For the Eighth Circuit

_____

No. 23-2311
_____

HCI Distribution, Inc.; Rock River Manufacturing, Inc.

*Plaintiffs - Appellees*

v.

Douglas Joseph Peterson, Nebraska Attorney General; Tony Fulton, Nebraska Tax
Commissioner

*Defendant*s

Michael Hilgers, Nebraska Attorney General; Glen A. White, Interim Nebraska
Tax Commissioner

*Defendants - Appellants*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: March 12, 2024
Filed: August 2, 2024
_____

Before BENTON, ERICKSON, and KOBES, Circuit Judges.
_____

KOBES, Circuit Judge.

The State of Nebraska requires tobacco product manufacturers to join a Master Settlement Agreement or put money in escrow based on the number of cigarettes they sell. Two tribal companies sued, arguing that the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, bars the State from enforcing this requirement, among others, against cigarettes they sell in Indian country. The district court enjoined enforcement for cigarettes sold on the Tribe's reservation. Nebraska appeals, and we reverse in part and remand with instructions to tailor the injunction.

I.

In the 1990s, nearly every state (including Nebraska) sued the largest cigarette manufacturers to recoup healthcare costs caused by tobacco-related illnesses. *Star Sci., Inc. v. Beales*, 278 F.3d 339, 343 (4th Cir. 2002). These lawsuits ended in a Master Settlement Agreement (MSA). *Grand River Enters. Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 933 (8th Cir. 2009). The MSA bans certain advertising practices, restricts lobbying, and requires cigarette manufacturers "to make payments to the settling states for all future cigarette sales in perpetuity." *Id.* In exchange, the settling states released their pending claims and any similar future ones. *Id.*

Since then, dozens of cigarette manufacturers have joined the MSA, agreeing to the restrictions in exchange for the releases. *Id.* Participating manufacturers shoulder higher costs, of course, because they pay the settling states based on their "relative national market share." *Id.* To protect the manufacturers' market share and profitability, the states agreed to enact statutes that neutralize the MSA's cost disadvantages. *Star Sci.*, 278 F.3d at 345–46.

Nebraska did just that. Its Escrow Statute requires tobacco product manufacturers to either join the MSA or place money in escrow for each cigarette sold—an option designed to track the MSA's costs. Neb. Rev. Stat. §§ 69-2703(1)–

(2)(a), (2)(b)(ii), 69-2702(14). Under the escrow option, the manufacturer receives the interest that accrues on its funds, and the funds are generally returned after 25 years. *See* § 69-2703(2)(b), (b)(iii). But the money may also be paid out to satisfy a judgment or settlement on any claim (of the kind released in the MSA) Nebraska brings against the manufacturer. § 69-2703(2)(b)(i). In addition to making the escrow payments, manufacturers must post a bond of $100,000 or the highest escrow amount due from the manufacturer over the past 20 calendar quarters—whichever is greater. § 69-2707.01(1)–(2). The State may draw from the bond to recover delinquent payments. § 69-2707.01(5). Although Indian tribes may "seek release of escrow [funds] deposited . . . on cigarettes sold on an Indian tribe's Indian country to its tribal members" by entering into an agreement with the State, these agreements do not eliminate their bond obligations. § 69-2703(2)(b)(iv).

Nebraska also requires tobacco product manufacturers to be listed in its Directory of Certified Tobacco Product Manufacturers and Brands. § 69-2706(1)(a). To be listed, manufacturers must certify that they have complied with the Escrow Statute, § 69-2706(1)(a), and manufacturers that choose not to join the MSA must also certify that they have posted the appropriate bond,[1] § 69-2706(d)(vi).

With this statutory framework in mind, we turn to the Winnebago Tribe of Nebraska, a federally recognized Indian Tribe that governs itself under the Indian Reorganization Act of 1934, 25 U.S.C. § 5123. In the mid-1990s, the Tribe founded Ho-Chunk, Inc., to diversify its revenue stream and develop economic opportunities for its members. Two of Ho-Chunk's wholly owned subsidiaries are the plaintiffs, Rock River Manufacturing, Inc., and HCI Distribution, Inc.

---

[1]The tribal companies challenge the Directory Statute insofar as it is tied to the escrow and bond requirements. The district court did not separately evaluate that statute, nor does the injunction mention it. We chart the same course and note that the companies' escrow and bond obligations as modified by the injunction are the obligations they must certify their compliance with under the Directory Statute.

Rock River is a cigarette manufacturer that purchases an off-reservation tobacco blend and then rolls and packages it on-reservation. Historically, it has also imported cigarettes from other manufacturers. It employs a handful of tribal members, plus a few nonmembers, and has been operating at a loss for nearly a decade. HCI Distribution purchases cigarettes from Rock River and sells them to tribal retailers (casinos and convenience stores) as well as others throughout the country. It too employs only a few tribal members and operates at a loss. In 2016, the companies entered into a Universal Tobacco Settlement Agreement with the Tribe, much of which parallels the MSA.

To fend off the threat of state enforcement, Rock River and HCI Distribution sued Nebraska,[2] seeking an injunction barring it from enforcing its escrow and bond requirements as to cigarettes they sell in Indian country (on its reservation and the Omaha Tribe of Nebraska's reservation). They argued that these requirements infringe on the Tribe's sovereignty, which is protected by the Indian Commerce Clause. After extensive discovery, the parties filed cross motions for summary judgment. The district court granted them in part and denied them in part: it balanced the state, tribal, and federal interests at stake under *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), and concluded that Nebraska could enforce its escrow and bond requirements against Rock River and HCI Distribution for cigarettes they sell on the Omaha Reservation but not for the ones they sell on their own reservation. Only Nebraska appeals.

II.

"We review de novo a district court's ruling on cross motions for summary judgment." *Green v. Byrd*, 972 F.3d 997, 1000 (8th Cir. 2020). Nebraska asks us to direct the entry of summary judgment in its favor, which we may do if there is

---

[2]The named defendants are Nebraska officials tasked with enforcing the challenged laws.

-4-

"no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A.

This case puts us at the crossroads of state regulatory authority and tribal self-government. Early in our Nation's history, the Supreme Court viewed Indian country as distinct from state territory and thus free from the force of its laws. *Organized Vill. of Kake v. Egan*, 369 U.S. 60, 72 (1962) (discussing the "general notion" in the early to mid-1800s). But that view has long since "yielded to closer analysis." *Id.* "Since the latter half of the 1800s, the Court has consistently and explicitly held that Indian reservations are part of the surrounding State," *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 636 (2022) (cleaned up) (citation omitted), and that state law may apply "even on reservations," *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973). That is not to say that state law applies to the same degree on a reservation as it does off it. *Nevada v. Hicks*, 533 U.S. 353, 362 (2001). After all, "Indian tribes retain attributes of sovereignty over both their members and their territory." *Bracker*, 448 U.S. at 142 (cleaned up) (citation omitted).

The "anomalous" and "complex character" of Indian tribes' "semi-independent position" as well as Congress's "broad power to regulate tribal affairs under the Indian Commerce Clause" have resulted in two related barriers to state regulatory authority. *Id.* (citation omitted). Federal law may expressly preempt state law, or it may impliedly preempt it if exercising state law would "unlawfully infringe" on tribal self-government. *Flandreau Santee Sioux Tribe v. Houdyshell*, 50 F.4th 662, 667 (8th Cir. 2022) (cleaned up) (citation omitted); *accord Castro-Huerta*, 597 U.S. at 649.

The extent of a state's regulatory power turns on the location of ("where") and participants in ("who") the targeted conduct. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 113 (2d Cir. 2014). "Indians going beyond reservation boundaries" are generally subject to state law. *Jones*, 411 U.S.

at 148–49.  But once a state reaches into a reservation, its power weakens.  *Otoe-Missouria Tribe*, 769 F.3d at 113; *see also Bracker*, 448 U.S. at 144–45.  That's when the "who" comes in.

"When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest."  *Hicks*, 533 U.S. at 362 (quoting *Bracker*, 448 U.S. at 144).  Only in "exceptional circumstances" may a State regulate the "on-reservation activities of tribal members."  *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 331–32 (1983).  The State's power increases, though, when its law targets the conduct of nonmembers,[3] *see Bracker*, 448 U.S. at 144–45, or members' "dealings" with nonmembers, *see California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1987).  These "[m]ore difficult" cases call for a "particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law."  *Bracker*, 448 U.S. at 144–45.

## B.

We first nail down the "who" and "where," starting with the "where."  Nebraska argues that Rock River's cigarette manufacturing reaches beyond reservation borders, so the companies are subject to Nebraska's escrow and bond requirements—no *Bracker* balancing required.  Because Rock River imports its tobacco, has historically imported cigarettes, and uses some nonmember labor, Nebraska says that Rock River operates largely off-reservation and that its products are not principally generated from the Tribe's resources.

---

[3]We use the term "nonmember" instead of "non-Indian" because members of other tribes generally "stand on the same footing" as non-Indians.  *Washington v. Confederated Tribes of Colville Rsrv.*, 447 U.S. 134, 161 (1980).

Nebraska points to *King Mountain Tobacco Co. v. McKenna*, 768 F.3d 989 (9th Cir. 2014). In that case, the Ninth Circuit held that a member-owned, on-reservation manufacturer had to comply with the State's escrow statute because it had engaged in "largely off-reservation," "tobacco-related activities" by shipping its crop off-reservation to be threshed and blended with more tobacco and by selling its cigarettes in about 17 states. *Id.* at 994, 998. The Ninth Circuit relied on *Jones*, *id.* at 994, where the Supreme Court held that New Mexico could tax the gross receipts of an *off*-reservation, tribally owned ski resort, *Jones*, 411 U.S. at 146, 157–58.

*King Mountain* is easily distinguished. Based on the undisputed facts at summary judgment, the district court there found that the manufacturer's "operations involve[d] extensive off-reservation activity" and that its products were "not principally generated from the use of reservation land and resources." 768 F.3d at 993. Key to *King Mountain*'s holding was that those findings were not clearly erroneous. *See id.* at 994 (noting appellants did not argue that the findings "were clearly erroneous" and seeing "no support for [their] implied argument that the district court clearly erred" by making them). By contrast, the district court here did not find that Rock River's tobacco-related activities are largely off-reservation or that its cigarettes aren't principally generated from reservation resources. Nor may we draw these inferences in favor of Nebraska, the party seeking summary judgment.[4] *Cox v. First Nat'l Bank*, 792 F.3d 936, 938 (8th Cir. 2015) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656–57, 660 (2014) (per curiam)).

---

[4]Nebraska does not say whether it is appealing the district court's partial grant of summary judgment to the tribal companies or partial denial to it—or both. *See United Fire & Cas. Co. v. Titan Contractors Serv., Inc.*, 751 F.3d 880, 886–87 (8th Cir. 2014) ("[W]hen a party appeals both the denial of its motion for summary judgment and the grant of summary judgment . . . , we may review both orders" because the denial "merges into the final order granting summary judgement," and we may, "if appropriate, direct the entry of summary judgment" in the appellant's favor. (cleaned up) (citation omitted)). Regardless, Nebraska asks us to award it summary judgment, so it must shoulder the movant's burden. *See Hawkeye Nat'l Life Ins. Co. v. AVIS Indus. Corp.*, 122 F.3d 490, 496 (8th Cir. 1997).

Nebraska's escrow and bond requirements are triggered by—and measured by—cigarette sales. *See* §§ 69-2703(2)(a), 69-2707.01(1)–(2). Because cigarette sales are the targeted conduct and the sales at issue here are the ones on the Winnebago Reservation, the reservation is the "where" for our analysis. *Cf. Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 99, 105–06 (2005) (holding that the "where" of Kansas's motor fuel tax, which was triggered at the point of first receipt, was "off-reservation" in a case involving non-Indian distributors who received the fuel off-reservation and then delivered it to an on-reservation, Indian-owned gas station).

Now the "who." Nebraska does not dispute that its escrow and bond requirements fall on a tribal member in this case. Nor could it. Its laws expressly say that *tobacco product manufacturers* must either join the MSA or put money in escrow based on the number of cigarettes they sell and post a bond, §§ 69-2703(1)–(2)(a), 69-2707.01(1), and Rock River is a tobacco product manufacturer wholly owned by the Tribe, *see Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1180, 1183 (10th Cir. 2012) (similar Oklahoma laws "regulate tobacco product manufacturers"). But that is not the end of the "who."

Even when a law directly regulates a tribal member, it matters whether the other participants in the targeted conduct are members or nonmembers. In *Cabazon*, for example, California tried to regulate the Tribes' on-reservation bingo games, which were "played predominantly by non-Indians coming onto the reservations." 480 U.S. at 205. Even though the laws directly regulated the Tribes that ran the games, the Supreme Court eschewed a test that would have required the State to show "exceptional circumstances" to assert its authority over the on-reservation activities of tribal members because the laws burdened the Tribes "in the context of their dealings with non-Indians." *See id.* at 214–16 (citation omitted). The Court instead used a traditional *Bracker* balancing analysis, asking whether the State's interests justified its assertion of regulatory authority over the games in light of the tribal and federal interests supporting them. *Id.* at 216–22; *see also Flandreau Santee Sioux Tribe v. Noem*, 938 F.3d 928, 933 (8th Cir. 2019) (construing *Cabazon*

as holding that the "federal and tribal interests in promoting Indian gaming outweighed the State's interest in preventing organized crime").

In this case, Nebraska's escrow and bond requirements target two transactions with very different implications for the Tribe's sovereignty. To assert its regulatory authority over the tribal companies' on-reservation cigarette sales to nonmembers, Nebraska's interests must "outweigh" the tribal and federal interests at stake. *See Noem*, 938 F.3d at 935. But for on-reservation sales to members, Nebraska must show exceptional circumstances to overcome the tribal and federal interests.[5] *See Cabazon*, 480 U.S. at 215.

C.

Our balancing of the state, federal, and tribal interests is "designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Bracker*, 448 U.S. at 145. "[W]e focus on 'the extent of federal regulation and control, the regulatory and revenue-raising interests of states and tribes, and the provision of state or tribal services.'" *Flandreau Santee Sioux Tribe v. Haeder*, 938 F.3d 941, 945 (8th Cir. 2019) (opinion of Loken, J.) (quoting Felix S. Cohen, *Handbook of Federal Indian Law* 707 (2012)).

We start with the federal interests. No one has identified a federal law or policy taking a position on tribal cigarette manufacturing or state regulation of it. This stands in sharp contrast to *Cabazon*, where the Federal Government had implemented policies to promote tribal bingo enterprises and provided financial assistance, demonstrating its "approval and active promotion" of them, 480 U.S. at 217–18, and *Mescalero Apache Tribe*, where it financed and supervised the Tribe's

---

[5]In a last-ditch effort to avoid *Bracker* balancing, Nebraska argues that *White Earth Band of Chippewa Indians v. Alexander*, 683 F.2d 1129 (8th Cir. 1982), requires a Tribe to first show that a challenged law is unreasonable and unrelated to state regulatory authority. But *Alexander* created no such prerequisite. *See id.* at 1138.

development and management of the wildlife resources that the State wanted to regulate, 462 U.S. at 325, 327–28. But nor is it like *Rice v. Rehner*, where the Federal Government "*authorized*, rather than pre-empted, state regulation over Indian liquor transactions" through a historical tradition of concurrent state and federal regulation. 463 U.S. 713, 726, 728–29 (1983) (emphasis added).

This is not to say that there are no federal interests at stake. The *Bracker* preemption analysis proceeds against a "backdrop" of tribal sovereignty, *Mescalero Apache Tribe*, 462 U.S. at 334 (quoting *Bracker*, 448 U.S. at 143), including Congress's "overriding goal of encouraging tribal self-sufficiency and economic development," *Cabazon*, 480 U.S. at 216 & n.19 (cleaned up) (citation omitted); *see also Mescalero Apache Tribe*, 462 U.S. at 334–35 & 335 n.17 (collecting "numerous federal statutes" embodying these goals, such as the Indian Reorganization Act). "These are important federal interests," *Cabazon*, 480 U.S. at 217, threatened by Nebraska's regulatory framework that economically burdens tribal cigarette manufacturing. So the federal interests tilt in favor of preemption, though not nearly as strongly as in cases where the Federal Government has blessed the Tribe's venture.

Next, the Tribe's interests. A tribe's interests in "[s]elf-determination and economic development" peak when it has significantly invested in a venture that serves as a major source of tribal funds or employment. *See id.* at 218–20; *see also Washington v. Confederated Tribes of Colville Rsrv.*, 447 U.S. 134, 156–57 (1980). In *Cabazon*, for example, the Tribes had a "substantial interest" in their bingo games, which "provide[d] the sole source of revenues for the operation of the tribal governments and the provision of tribal services," were the "major sources of employment on the reservations," and were played in "modern facilities" they had built. 480 U.S. at 218–20. Similarly, in *Mescalero Apache Tribe*, the Tribe had "engaged in a concerted and sustained undertaking to develop and manage the reservation's wildlife and land resources," which "generate[d] funds for essential tribal services and provide[d] employment for members." 462 U.S. at 341. A tribe's interests bottom out when its venture adds little to no on-reservation value. Take

*Colville*, where the Tribes merely imported cigarettes for resale, and it was "painfully apparent" that they were selling a chance to evade state taxes, not value "generated on the reservations." 447 U.S. at 144–45, 155.

This case is somewhere in between. The tribal companies do more than sell a chance to evade state law, that much is true. They generate on-reservation value by transforming raw materials into finished products and by capitalizing on different links in the supply chain. But they employ only a handful of tribal members and have been operating at a loss for years. If they were profitable, they would remit some funds to the Tribe, yet in the companies' own words, every dollar they lose "deprives the Tribe of operating funds." Even when HCI Distribution was profitable, it remitted only about $1.5 million over a few years to the Tribe. Contrast that with its parent company, Ho-Chunk, which has seen great economic success. In 2018, for example, a year that Rock River and HCI Distribution lost money, Ho-Chunk gave the Tribe over $180 million in dividends and donations. The parent's success, though, is not its subsidiaries' to claim. Cigarette manufacturing is hardly a source of employment or revenue for tribal services, so the Tribe's self-determination and economic development interests are not strong.

That said, the Tribe has an interest in applying its own regulatory scheme—the Universal Tobacco Settlement Agreement—to tribal cigarette manufacturing. And most importantly here, it has a strong interest in protecting the health of its members who may be harmed by tribally manufactured tobacco products. As the district court found, the "Tribe, not the State, carries the burden of protecting its members who may be harmed by products manufactured by a tribal business." Part of why the Tribe entered into the Agreement in the first place was because it had "struggled financially to care for [its] tribal members made ill from the direct and indirect inhalation of cigarette smoke" and had received no compensation from the State. Entering into the Agreement, it hoped, would "provid[e] a true and significant benefit to tribal members in need of assistance."

-11-

Now to the State's interests. Like the Tribe, Nebraska has a "separate sovereign interest in being in control of, and able to apply, its laws throughout its territory," *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 476 (2d Cir. 2013) (citing *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 188 (1989)), which includes the Winnebago Reservation, *see Castro-Huerta*, 597 U.S. at 655. The State also has a strong interest in protecting the health of its citizens—members and nonmembers alike. *See Grand River*, 574 F.3d at 942 ("Unquestionably, the State possesses a legitimate public interest in the health of its citizens."); *cf. Castro-Huerta*, 597 U.S. at 651 (State's interest in public safety covers both Indians and non-Indians). Nebraska enacted its escrow and bond requirements to "safeguard the [MSA], the fiscal soundness of the state, and the public health," § 69-2704, and these requirements further those interests by ensuring the State can secure judgments against wrongdoers who harm its citizens and drain its fisc by causing public health expenditures.

On balance, for on-reservation cigarette sales to nonmembers, the State's strong interest in protecting public health and redressing harm outweighs the Tribe's and Federal Government's comparatively minimal interests. But the tables are turned when it comes to cigarette sales to members. In these transactions, the Tribe bears the brunt of protecting the buyers' health and recovering public health costs. So the State's interests do not outweigh the Tribe's and Federal Government's—let alone amount to exceptional circumstances. Because the State's interests do not justify asserting its regulatory authority over the tribal companies' on-reservation, member-to-member cigarette sales, federal law preempts Nebraska's escrow and bond requirements for those sales.

D.

One final issue: the proper scope of relief. We hold that Nebraska's escrow and bond requirements run afoul of the Indian Commerce Clause as applied to the tribal companies' on-reservation, member-to-member cigarette sales. So in crafting a remedy, we must ask whether the Nebraska Legislature would have preferred to

apply what is left of those requirements or nothing at all. *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 330 (2006) ("After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?").

The general rule is that "when confronting a constitutional problem in a law, courts should 'limit the solution' by enjoining enforcement of 'any problematic portions while leaving the remainder intact.'" *Sisney v. Kaemingk*, 15 F.4th 1181, 1194 (8th Cir. 2021) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010)). But the tribal companies take an all-or-nothing approach, insisting that crafting an injunction to cover only on-reservation, member-to-member sales would be legislating from the bench. We disagree. It is our job "not to nullify more of a legislature's work than is necessary" so that we preserve, as best we can, what the people's democratically elected officials wanted. *Ayotte*, 546 U.S. at 329.

We craft a solution tailored to the problem. Under Nebraska law, part of a statute "is severable if a workable plan remains after severance, the valid portions are independently enforceable, the invalid portion did not serve as such an inducement to the valid parts that the valid parts would not have passed without the invalid part, and severance will not violate the [Legislature's] intent." *Jones v. Gale*, 470 F.3d 1261, 1271 (8th Cir. 2006) (cleaned up) (quoting *Jaksha v. State*, 486 N.W.2d 858, 873 (Neb. 1992)). We are confident that enjoining Nebraska from enforcing its escrow and bond requirements against member-to-member sales on the Winnebago Reservation leaves in place a workable, independently enforceable plan that is not contrary to legislative intent. After all, the Nebraska Legislature itself enacted a materially similar regulatory carve out: tribes may "seek release of escrow [funds] deposited . . . on cigarettes sold on an Indian tribe's Indian country to its tribal members" by agreement with the State. § 69-2703(2)(b)(iv). Our remedy simply allows the tribal companies to hold onto these funds at the outset.

-13-

### III.

"It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government." *McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 172 (1973). The Winnebago Tribe's sovereignty bars Nebraska's escrow and bond requirements for the tribal companies' on-reservation, member-to-member cigarette sales. But Nebraska may enforce those requirements against the companies' cigarette sales to nonmembers.

We reverse in part and remand with instructions to tailor the injunction: Nebraska is enjoined from enforcing §§ 69-2703 and 69-2707.01 against Rock River and HCI Distribution as to cigarettes they sell, and have sold, on the Winnebago Reservation to members of the Winnebago Tribe.

ERICKSON, Circuit Judge, concurring in part and dissenting in part.

The Winnebago Tribe of Nebraska is a federally recognized Indian Tribe that, through a holding company, owns Rock River Manufacturing, Inc. and HCI Distribution, Inc. Rock River has a production facility on the Reservation where it employs some tribal members to manufacture tobacco products. HCI Distribution purchases Rock River's tobacco products and distributes them to, among other places, the Tribe's casinos. The issue before the Court is whether the State of Nebraska may enforce its cigarette escrow and bond laws against these tribal companies for conduct occurring solely on the Winnebago reservation.

The Supreme Court has repeatedly recognized "a firm federal policy of promoting tribal self-sufficiency and economic development." White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143 (1980). No express congressional statement of preemption is required for a court to determine that a state law is preempted when it infringes on tribal sovereignty. Id. at 144. State law is typically preempted when applied to the conduct of tribal members on the reservation. Id.

-14-

Only in "exceptional circumstances" may a state enforce its laws against member conduct on the reservation. New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 331-32 (1983).

The majority agrees with the district court that the State's escrow and bond requirements apply directly to the manufacturers of tobacco products. The State provided no exceptional circumstance justifying the application of these laws to member activity on the Reservation, so the district court correctly granted an injunction against enforcement of the laws on member purchases of tobacco products.

This leaves nonmember purchases of tobacco products on the Reservation. Determining the validity of state law over nonmember activity requires a "particularized inquiry into the nature of the state, federal, and tribal interests at stake . . . to determine whether, in the specific context, the exercise of state authority would violate federal law." Bracker, 448 U.S. at 145. The federal government and the Tribe have parallel interests in tribal self-determination and economic development on the reservation. California v. Cabazon Band of Mission Indians, 480 U.S. 202, 219 (1987).

Rock River has a facility on the Reservation, manufactures goods, and employs some tribal members. See id. (finding a facility on the reservation and employment of tribal members relevant to the economic development interest). HCI Distribution employs some tribal members and distributes the tobacco products to the Tribe's casinos where they are sold as goods ancillary to the gambling experience. See Flandreau Santee Sioux Tribe v. Noem, 938 F.3d 928, 936 (8th Cir. 2019) (noting the sale of goods and services at the Casino contributes to the success of the gaming operation).

Rock River and HCI Distribution are part of a sophisticated vertically integrated business, so their activities support other tribal companies operating on the Reservation. While the overall business operation provides significant income

-15-

to the Tribe, Rock River has operated at a loss since 2016, and HCI Distribution started operating at a loss after this lawsuit commenced. The majority uses these operating losses to discount the Tribe's interest. However, there is nothing in Supreme Court precedent that diminishes the federal and tribal interests in self-determination and economic development if a company is operating at a loss. Such a rule invites further state regulation of activities on the reservation and chips away at tribal sovereignty.

In contrast, the State's interest is in protecting public health in the event a tobacco product manufacturer causes harm. This interest is undercut in part by the Tribe's own tobacco settlement agreement with Rock River and HCI Distribution, which includes protections for the public health and requires them to make payments to the Tribe. The Tribe uses this money to improve the public health and wellness of tribal members. On balance, I find the federal and tribal interests outweigh the State's interest.

Based on the foregoing, I agree with the district court's thorough and well-reasoned decision and would affirm.

_____